# SCHAD *v.* ARIZONA

No. 90–5551.   Argued February 27, 1991—Decided June 21, 1991

*Denise I. Young* argued the cause for petitioner. With her on the briefs was *John M. Bailey.*

*R. Wayne Ford,* Assistant Attorney General of Arizona, argued the cause for respondent. With him on the brief were *Robert K. Corbin,* Attorney General, and *Ronald L. Crismon.**

*Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Joel M. Gershowitz;* and for the

JUSTICE SOUTER announced the judgment of the Court and delivered the opinion of the Court with respect to Part III, and an opinion with respect to Parts I and II, in which THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE KENNEDY join.

This case presents two questions: whether a first-degree murder conviction under jury instructions that did not require agreement on whether the defendant was guilty of premeditated murder or felony murder is unconstitutional; and whether the principle recognized in *Beck* v. *Alabama*, 447 U. S. 625 (1980), entitles a defendant to instructions on all offenses that are lesser than, and included within, a capital offense as charged. We answer no to each.

## I

On August 9, 1978, a highway worker discovered the badly decomposed body of 74-year-old Lorimer Grove in the underbrush off U. S. Highway 89, about nine miles south of Prescott, Arizona. There was a rope around his neck, and a coroner determined that he had been strangled to death. The victim had left his home in Bisbee, Arizona, eight days earlier, driving his new Cadillac and towing a camper.

*Commonwealth of Kentucky* et al. by *Frederick J. Cowan*, Attorney General of Kentucky, and *Denise A. Garrison* and *Ian G. Sonego*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *John K. Van de Kamp* of California, *John J. Kelly* of Connecticut, *Charlie M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *James T. Jones* of Idaho, *Linley E. Pearson* of Indiana, *J. Joseph Curran, Jr.*, of Maryland, *Michael C. Moore* of Mississippi, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Brian McKay* of Nevada, *Robert J. Del Tufo* of New Jersey, *Hal Stratton* of New Mexico, *Lacy H. Thornburg* of North Carolina, *Anthony J. Celebrezze, Jr.*, of Ohio, *Robert H. Henry* of Oklahoma, *Ernest D. Preate, Jr.*, of Pennsylvania, *T. Travis Medlock* of South Carolina, *Roger Tellinghuisen* of South Dakota, *Charles Burson* of Tennessee, *R. Paul Van Dam* of Utah, and *Mary Sue Terry* of Virginia.

On September 3, 1978, petitioner, driving Grove's Cadillac, was stopped for speeding by the New York State Police. He told the officers that he was transporting the car for an elderly friend named Larry Grove. Later that month, petitioner was arrested in Salt Lake City, Utah, for a parole violation and possession of a stolen vehicle. A search of the Cadillac, which petitioner was still driving, revealed personal belongings of Grove's, and petitioner's wallet contained two of Grove's credit cards, which petitioner had begun using on August 2, 1978. Other items belonging to Grove were discovered in a rental car which had been found abandoned off Highway 89 on August 3, 1978; petitioner had rented the car the previous December and never returned it. While in custody in Salt Lake City, petitioner told a visitor that he would "'deny being in any area of Arizona or the State of Arizona, particularly Tempe, Arizona and Prescott, Arizona.'" 163 Ariz. 411, 414, 788 P. 2d 1162, 1165 (1989).

A Yavapai County, Arizona, grand jury indicted petitioner on one count of first-degree murder, and petitioner was extradited to stand trial. The Arizona statute applicable to petitioner's case defined first-degree murder as "murder which is . . . wilful, deliberate or premeditated . . . or which is committed . . . in the perpetration of, or attempt to perpetrate, . . . robbery." Ariz. Rev. Stat. Ann. § 13–452 (Supp. 1973).[1] Petitioner was convicted and sentenced to death,

---

[1] The full statute provided:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years, is murder of the first degree. All other kinds of murder are of the second degree."

The statute has since been revised, but both premeditated murder and murder in the course of a robbery still constitute first-degree murder. See Ariz. Rev. Stat. Ann. § 13–1105.A (1989).

but his conviction was set aside on collateral review. 142 Ariz. 619, 691 P. 2d 710 (1984).

At petitioner's retrial, the prosecutor advanced theories of both premeditated murder and felony murder, against which petitioner claimed that the circumstantial evidence proved at most that he was a thief, not a murderer. The court instructed the jury that "[f]irst degree murder is murder which is the result of premeditation. . . . Murder which is committed in the attempt to commit robbery is also first degree murder." App. 26. The court also instructed that "[a]ll 12 of you must agree on a verdict. All 12 of you must agree whether the verdict is guilty or not guilty." *Id.*, at 27.

The defense requested a jury instruction on theft as a lesser included offense. The court refused, but did instruct the jurors on the offense of second-degree murder, and gave them three forms for reporting a verdict: guilty of first-degree murder; guilty of second-degree murder; and not guilty. The jury convicted petitioner of first-degree murder, and, after a further hearing, the judge sentenced petitioner to death.

The Arizona Supreme Court affirmed. 163 Ariz. 411, 788 P. 2d 1162 (1989). The court rejected petitioner's contention that the trial court erred in not requiring the jury to agree on a single theory of first-degree murder, explaining:

"'In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder. Although a defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed.'" *Id.*, at 417; 788 P. 2d, at 1168 (quoting *State* v. *Encinas*, 132 Ariz. 493, 496, 647 P. 2d 624, 627 (1982)) (citations omitted).

The court also rejected petitioner's argument that *Beck* v. *Alabama, supra,* required an instruction on the lesser in-

cluded offense of robbery. 163 Ariz., at 416–417, 788 P. 2d, at 1167–1168.

We granted certiorari. 498 U. S. 894 (1990).

## II

Petitioner's first contention is that his conviction under instructions that did not require the jury to agree on one of the alternative theories of premeditated and felony murder is unconstitutional.[2] He urges us to decide this case by holding that the Sixth, Eighth, and Fourteenth Amendments require a unanimous jury in state capital cases, as distinct from those where lesser penalties are imposed. See *Johnson* v. *Louisiana*, 406 U. S. 356 (1972); *Apodaca* v. *Oregon*, 406 U. S. 404 (1972). We decline to do so, however, because the suggested reasoning would beg the question raised. Even assuming a requirement of jury unanimity *arguendo*, that assumption would fail to address the issue of what the jury must be unanimous about. Petitioner's jury was unanimous in deciding that the State had proved what, under state law, it had to prove: that petitioner murdered either with premeditation or in the course of committing a robbery. The question still remains whether it was constitutionally acceptable to permit the jurors to reach one verdict based on any combination of the alternative findings. If it was, then the jury was unanimous in reaching the verdict, and petitioner's proposed unanimity rule would not help him. If it was not, and the jurors may not combine findings of premeditated and felony murder, then petitioner's conviction will fall even without his proposed rule, because the instructions allowed for the forbidden combination.

In other words, petitioner's real challenge is to Arizona's characterization of first-degree murder as a single crime as to

---

[2] Respondent contends that petitioner waived this contention by failing to raise it in the lower Arizona courts. Brief for Respondent 8–10. The Arizona Supreme Court, however, addressed the contention on the merits, 163 Ariz. 411, 417, 788 P. 2d 1162, 1168 (1989), thereby preserving the issue for our review. See *Orr* v. *Orr*, 440 U. S. 268, 274–275 (1979).

which a verdict need not be limited to any one statutory alternative, as against which he argues that premeditated murder and felony murder are separate crimes as to which the jury must return separate verdicts. The issue in this case, then, is one of the permissible limits in defining criminal conduct, as reflected in the instructions to jurors applying the definitions, not one of jury unanimity.

## A

A way of framing the issue is suggested by analogy. Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed. In *Andersen* v. *United States*, 170 U. S. 481 (1898), for example, we sustained a murder conviction against the challenge that the indictment on which the verdict was returned was duplicitous in charging that death occurred through both shooting and drowning. In holding that "the Government was not required to make the charge in the alternative," *id.*, at 504, we explained that it was immaterial whether death was caused by one means or the other. Cf. *Borum* v. *United States*, 284 U. S. 596 (1932) (upholding the murder conviction of three codefendants under a count that failed to specify which of the three did the actual killing); *St. Clair* v. *United States*, 154 U. S. 134, 145 (1894). This fundamental proposition is embodied in Federal Rule of Criminal Procedure 7(c)(1), which provides that "[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."

We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the

bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *McKoy* v. *North Carolina*, 494 U. S. 433, 449 (1990) (BLACKMUN, J., concurring) (footnotes omitted).

The alternatives in the cases cited went, of course, to possibilities for proving the requisite *actus reus*, while the present case involves a general verdict predicated on the possibility of combining findings of what can best be described as alternative mental states, the one being premeditation, the other the intent required for murder combined with the commission of an independently culpable felony. See *State* v. *Serna*, 69 Ariz. 181, 188, 211 P. 2d 455, 459 (1949) (in Arizona, the attempt to commit a robbery is "the legal equivalent of . . . deliberation, premeditation, and design").[3] We see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*.

That is not to say, however, that the Due Process Clause places no limits on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course or state actually occurred. The axiomatic requirement of due process that a statute may not forbid conduct in terms so vague that people of common intelligence would be relegated to differing guesses about its meaning, see *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939) (citing *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926)), carries the practical consequence that a defendant charged under a valid statute will be in a position to understand with some specificity the legal basis of the charge

---

See also Wechsler, A Rationale of the Law of Homicide: I, 37 Colum. L. Rev. 701, 702–703 (1937); Perkins, A Rationale of Mens Rea, 52 Harv. L. Rev. 905, 926 (1939).

against him. Thus it is an assumption of our system of criminal justice "'so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Speiser* v. *Randall*, 357 U. S. 513, 523 (1958) (quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934)), that no person may be punished criminally save upon proof of some specific illegal conduct. Just as the requisite specificity of the charge may not be compromised by the joining of separate offenses, see *United States* v. *UCO Oil Co.*, 546 F. 2d 833 (CA9 1976), cert. denied, 430 U. S. 966 (1977), nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction.[4]

To say, however, that there are limits on a State's authority to decide what facts are indispensable to proof of a given offense is simply to raise the problem of describing the point at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses. See generally Note, 91 Harv. L. Rev. 499, 501–502 (1977). Although we have never before attempted to define what constitutes an immaterial difference as to mere means and what constitutes a material difference requiring separate theories of crime to be treated as separate offenses subject to separate jury findings, there is a body of law in the federal circuits, deriving primarily from the decision of the Fifth Cir-

---

[4] Although our vagueness cases support the notion that a requirement of proof of specific illegal conduct is fundamental to our system of criminal justice, the principle is not dependent upon, or limited by, concerns about vagueness. A charge allowing a jury to combine findings of embezzlement and murder would raise identical problems regardless of how specifically embezzlement and murder were defined.

cuit in *United States* v. *Gipson*, 553 F. 2d 453 (1977) (Wisdom, J.), that addresses this problem.

The defendant in *Gipson* was charged with violating 18 U. S. C. § 2313 (1982 ed.), which prohibited knowingly "receiv[ing], conceal[ing], stor[ing], barter[ing], sell[ing] or dispos[ing] of" any stolen vehicle or aircraft moving in interstate commerce, and was convicted after the trial judge charged the jury that it need not agree on which of the enumerated acts the defendant had committed. The Fifth Circuit reversed, reasoning that the defendant's right to "jury consensus as to [his] course of action"[5] was violated by the joinder in a single count of "two distinct conceptual groupings," receiving, concealing, and storing forming the first grouping (referred to by the court as "housing"), and bartering, selling, and disposing ("marketing") constituting the second. *Id.*, at 456–459. In that court's view, the acts within a conceptual grouping are sufficiently similar to obviate the need for jurors to agree about which of them was committed, whereas the acts in distinct conceptual groupings are so unrelated that the jury must decide separately as to each grouping. A number of lower courts have adopted the standard of "distinct conceptual groupings" as the appropriate test. *E. g., United States* v. *Peterson*, 768 F. 2d 64 (CA2) (Friendly, J.), cert. denied, 474 U. S. 923 (1985); *United States* v. *Duncan*, 850 F. 2d 1104, 1113 (CA6 1988), cert. de-

---

[5] The court identified this right as a concomitant of the federal criminal defendant's Sixth Amendment right to a unanimous verdict, and subsequent courts following *Gipson* have adopted that characterization. *E. g., United States* v. *Beros*, 833 F. 2d 455 (CA3 1987). For the reasons given earlier, we think the right is more accurately characterized as a due process right than as one under the Sixth Amendment. Although this difference in characterization is important in some respects (chiefly, because a state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict, see *Johnson* v. *Louisiana*, 406 U. S. 356 (1972); *Apodaca* v. *Oregon*, 406 U. S. 404 (1972)), it is immaterial to the problem of how to go about deciding what level of verdict specificity is constitutionally necessary.

nied *sub nom. Downing* v. *United States*, 493 U. S. 1025 (1990); *State* v. *Baldwin*, 101 Wis. 2d 441, 449–450, 304 N. W. 2d 742, 747–749 (1981).

We are not persuaded that the *Gipson* approach really answers the question, however. Although the classification of alternatives into "distinct conceptual groupings" is a way to express a judgment about the limits of permissible alternatives, the notion is too indeterminate to provide concrete guidance to courts faced with verdict specificity questions. See, *e. g., Rice* v. *State*, 311 Md. 116, 133, 532 A. 2d 1357, 1365 (1987) (criticizing *Gipson* criteria as "not entirely clear" and as "provid[ing] little guidance"); Trubitt, Patchwork Verdicts, Different-Jurors Verdicts, and American Jury Theory: Whether Verdicts Are Invalidated by Juror Disagreement on Issues, 36 Okla. L. Rev. 473, 548–549 (1983) (same). This is so because conceptual groupings may be identified at various levels of generality, and we have no *a priori* standard to determine what level of generality is appropriate. Indeed, as one judge has noted, even on the facts of *Gipson* itself, "[o]ther conceptual groupings of the six acts are possible. [One might] put all six acts into one conceptual group, namely trafficking in stolen vehicles." *Manson* v. *State*, 101 Wis. 2d 413, 438, 304 N. W. 2d 729, 741 (1981) (Abrahamson, J., concurring); accord, Trubitt, *supra*, at 548–549 ("[I]t is difficult to see how a court could determine that 'housing' and 'marketing' are ultimate acts in some metaphysical or constitutional sense, and thus prohibit the legislature from including them in the single offense of trafficking"). In short, the notion of "distinct conceptual groupings" is simply too conclusory to serve as a real test.

The dissent would avoid the indeterminacy of the *Gipson* approach by adopting an inflexible rule of maximum verdict specificity. In the dissent's view, whenever a statute lists alternative means of committing a crime, "the jury [must] indicate on which of the alternatives it has based the defendant's guilt," *post*, at 656, even where there is no indication

that the statute seeks to create separate crimes. This approach rests on the erroneous assumption that any statutory alternatives are *ipso facto* independent elements defining independent crimes under state law, and therefore subject to the axiomatic principle that the prosecution must prove independently every element of the crime. See *post*, at 656–658 (citing *In re Winship*, 397 U. S. 358 (1970), and *Sandstrom* v. *Montana*, 442 U. S. 510 (1979)). In point of fact, as the statute at issue in *Gipson* demonstrates, legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes.[6] The question whether statutory alternatives constitute independent elements of the offense therefore does not, as the dissent would have it, call for a mere tautology; rather, it is a substantial question of statutory construction. See, *e. g.*, *United States* v. *UCO Oil Co.*, 546 F. 2d, at 835–838.

In cases, like this one, involving state criminal statutes, the dissent's "statutory alternatives" test runs afoul of the fundamental principle that we are not free to substitute our own interpretations of state statutes for those of a State's courts. If a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law. See *Mullaney* v. *Wilbur*, 421 U. S. 684, 690–691 (1975) (declining to reexamine the Maine

---

[6] Because statutes frequently enumerate alternatives that clearly are mere means of satisfying a single element of an offense, adoption of the dissent's approach of requiring a specific verdict as to every alternative would produce absurd results. For example, the Arizona first-degree murder statute at issue here prohibited, *inter alia*, "wilful, deliberate or premeditated killing." Ariz. Rev. Stat. Ann. § 13–452 (Supp. 1973) (emphasis added). Under the dissent's approach, juries in prosecutions brought under the statute presumably should have been required to deliver specific verdicts as to each of the three: wilfullness, deliberation, and premeditation.

Supreme Judicial Court's decision that, under Maine law, all intentional or criminally reckless killings are aspects of the single crime of felonious homicide); *Murdock* v. *City of Memphis*, 20 Wall. 590 (1875). In the present case, for example, by determining that a general verdict as to first-degree murder is permissible under Arizona law, the Arizona Supreme Court has effectively decided that, under state law, premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element. The issue in this case therefore is not whether "the State must be held to its choice," *post*, at 657–658, for the Arizona Supreme Court has authoritatively determined that the State has chosen not to treat premeditation and the commission of a felony as independent elements of the crime, but rather whether Arizona's choice is unconstitutional.

## B

It is tempting, of course, to follow the example of *Gipson* to the extent of searching for some single criterion that will serve to answer the question facing us. We are convinced, however, of the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution, and we think that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, see, *e. g.*, *Dowling* v. *United States*, 493 U. S. 342, 352–353 (1990), and for the rationality that is an essential component of that fairness. In translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the *mens rea* element of a single offense. The enquiry is undertaken with a threshold presumption of legis-

lative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.

## 1

Judicial restraint necessarily follows from a recognition of the impossibility of determining, as an *a priori* matter, whether a given combination of facts is consistent with there being only one offense. Decisions about what facts are material and what are immaterial, or, in terms of *Winship, supra,* at 364, what "fact[s] [are] necessary to constitute the crime," and therefore must be proved individually, and what facts are mere means, represent value choices more appropriately made in the first instance by a legislature than by a court. Respect for this legislative competence counsels restraint against judicial second-guessing, cf. *Rostker* v. *Goldberg,* 453 U. S. 57, 65 (1981) ("[L]ack of competence on the part of the courts" relative to the legislature so counsels), which is particularly appropriate in cases, like this one, that call state definitions into question. "It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, *Irvine* v. *California,* 347 U. S. 128, 134 (1954) (plurality opinion), and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Patterson* v. *New York,* 432 U. S. 197, 201 (1977).

There is support for such restraint in our "burden-shifting" cases, which have made clear, in a slightly different context, that the States must be permitted a degree of flexibility in defining the "fact[s] necessary to constitute the crime" under *Winship.* Each of those cases arose because a State defined an offense in such a way as to exclude some particular fact from those to be proved beyond a reasonable doubt, either by placing the burden on defendants to prove a mitigating fact, see *Patterson, supra* (extreme emotional disturbance); *Martin* v. *Ohio,* 480 U. S. 228 (1987) (self-defense); see also *Mul-*

*laney, supra* (heat of passion or sudden provocation), or by allowing the prosecution to prove an aggravating fact by some standard less than that of reasonable doubt, *McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986) (possession of a firearm). In each case, the defendant argued that the excluded fact was inherently "a fact necessary to constitute the offense" that required proof beyond a reasonable doubt under *Winship*, even though the fact was not formally an element of the offense with which he was charged. See, *e. g., id.*, at 90.

The issue presented here is similar, for under Arizona law neither premeditation nor the commission of a felony is formally an independent element of first-degree murder; they are treated as mere means of satisfying a *mens rea* element of high culpability. The essence of petitioner's argument is that, despite this unitary definition of the offense, each of these means must be treated as an independent element as to which the jury must agree, because premeditated murder and felony murder are inherently separate offenses. Both here and in the burden-shifting cases, in other words, a defendant argues that the inherent nature of the offense charged requires the State to prove as an element of the offense some fact that is not an element under the legislative definition.

In the burden-shifting cases, as here, we have faced the difficulty of deciding, as an abstract matter, what elements an offense must comprise. Recognizing "[o]ur inability to lay down any 'bright line' test," *McMillan*, 477 U. S., at 91, we have "stressed that . . . the state legislature's definition of the elements of the offense is usually dispositive." *Id.*, at 85; see also *Patterson, supra*, at 201–202. We think that similar restraint is appropriate here, although we recognize that, as in the burden-shifting cases, "there are obviously constitutional limits beyond which the States may not go." *Patterson, supra*, at 210; see also *McMillan, supra*, at 86.

2

The use here of due process as a measurement of the sense of appropriate specificity assumes the importance of history and widely shared practice as concrete indicators of what fundamental fairness and rationality require.  In turning to these sources we again follow the example set in the burden-shifting cases, where we have often found it useful to refer both to history and to the current practice of other States in determining whether a State has exceeded its discretion in defining offenses.  See *Patterson, supra,* at 202, 207–209, nn. 10–11; see also *Martin, supra,* at 235–236; *Mullaney,* 421 U. S., at 692–696.  Where a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has shifted the burden of proof as to what is an inherent element of the offense, or has defined as a single crime multiple offenses that are inherently separate.  Conversely, a freakish definition of the elements of a crime that finds no analogue in history[7] or in the criminal law of other jurisdictions will lighten the defendant's burden.

Thus, it is significant that Arizona's equation of the mental states of premeditated murder and felony murder as species of the blameworthy state of mind required to prove a single offense of first-degree murder finds substantial historical and contemporary echoes.  At common law, murder was defined as the unlawful killing of another human being with "malice aforethought."  The intent to kill and the intent to commit a felony were alternative aspects of the single concept of "malice aforethought."  See 3 J. Stephen, History of the Criminal Law of England 21–22 (1883).  Although American jurisdictions have modified the common law by legislation classifying murder by degrees, the resulting statutes have

---

[7] We note, however, the perhaps obvious proposition that history will be less useful as a yardstick in cases dealing with modern statutory offenses lacking clear common-law roots than it is in cases, like this one, that deal with crimes that existed at common law.

in most cases retained premeditated murder and some form of felony murder (invariably including murder committed in perpetrating or attempting to perpetrate a robbery) as alternative means of satisfying the mental state that first-degree murder presupposes. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.5, pp. 210–211, and nn. 21, 23, 24 (1986); ALI, Model Penal Code § 210.2, p. 32, and n. 78 (1980). Indeed, the language of the Arizona first-degree murder statute applicable here is identical in all relevant respects to the language of the first statute defining murder by differences of degree, passed by the Pennsylvania Legislature in 1794.[8]

A series of state-court decisions, beginning with the leading case of *People* v. *Sullivan,* 173 N. Y. 122, 65 N. E. 989 (1903), have agreed that "it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute." *Id.,* at 127, 65 N. E., at 989–990. See *People* v. *Milan,* 9 Cal. 3d 185, 507 P. 2d 956 (1973); *People* v. *Travis,* 170 Ill. App. 3d 873, 525 N. E. 2d 1137 (1988), cert. denied, 489 U. S. 1024 (1989); *State* v. *Fuhrmann,* 257 N. W. 2d 619 (Iowa 1977); *State* v. *Wilson,* 220 Kan. 341, 552 P. 2d 931 (1976); *Commonwealth* v. *Devlin,* 335 Mass. 555, 141 N. E. 2d 269 (1957); *People* v. *Embree,* 70 Mich. App.

---

[8] The Pennsylvania statute provided:

"[A]ll murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree." 1794 Pa. Laws, ch. 1766, § 2.

382, 246 N. W. 2d 6 (1976); *State* v. *Buckman*, 237 Neb. 936, 468 N. W. 2d 589 (1991); *James* v. *State*, 637 P. 2d 862 (Okla. Crim. 1981); *State* v. *Tillman*, 750 P. 2d 546 (Utah 1987); see also *Brown* v. *State*, 473 So. 2d 1260 (Fla.), cert. denied, 474 U. S. 1038 (1985). Although the state courts have not been unanimous in this respect, see *State* v. *Murray*, 308 Ore. 496, 782 P. 2d 157 (1989), there is sufficiently widespread acceptance of the two mental states as alternative means of satisfying the *mens rea* element of the single crime of first-degree murder to persuade us that Arizona has not departed from the norm.

Such historical and contemporary acceptance of Arizona's definition of the offense and verdict practice is a strong indication that they do not "'offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Patterson*, 432 U. S., at 202 (quoting *Speiser*, 357 U. S., at 523), for we recognize the high probability that legal definitions, and the practices comporting with them, are unlikely to endure for long, or to retain wide acceptance, if they are at odds with notions of fairness and rationality sufficiently fundamental to be comprehended in due process. Cf. *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922) (Holmes, J.); *Snyder*, 291 U. S., at 111.

This is not to say that either history or current practice is dispositive. In *McMillan*, for example, even though many States had made the fact at issue (possession of a weapon) an element of various aggravated offenses, we were unwilling to conclude that Pennsylvania's decision to treat it as an aggravating circumstance provable at sentencing by a mere preponderance of the evidence deviated so far from the constitutional norm as to violate the Due Process Clause. "That Pennsylvania's particular approach has been adopted in few other States," we observed, "does not render Pennsylvania's choice unconstitutional." 477 U. S., at 90; see also *Martin*, 480 U. S., at 235–236 (relying on history, but not current practice); *Patterson*, *supra*, at 211. Conversely, "'neither

the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack.'" *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 18 (1991) (quoting *Williams* v. *Illinois*, 399 U. S. 235, 239 (1970)). In fine, history and current practice are significant indicators of what we as a people regard as fundamentally fair and rational ways of defining criminal offenses, which are nevertheless always open to critical examination.

3

It is, as we have said, impossible to lay down any single analytical model for determining when two means are so disparate as to exemplify two inherently separate offenses. In the case before us, however, any scrutiny of the two possibilities for proving the *mens rea* of first-degree murder may appropriately take account of the function that differences of mental state perform in defining the relative seriousness of otherwise similar or identical criminal acts. See generally ALI, Model Penal Code § 2.02(2) (1985) (defining differing mental states). If, then, two mental states are supposed to be equivalent means to satisfy the *mens rea* element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether. Petitioner has made out no case for such moral disparity in this instance.

The proper critical question is not whether premeditated murder is necessarily the moral equivalent of felony murder in all possible instances of the latter. Our cases have recognized that not all felony murders are of identical culpability, compare *Tison* v. *Arizona*, 481 U. S. 137 (1987), with *Enmund* v. *Florida*, 458 U. S. 782 (1982), and the same point is suggested by examining state murder statutes, which frequently diverge as to what felonies may be the predicate of a felony-murder conviction. Compare, *e. g.*, Tenn. Code Ann.

§ 39–13–202 (Supp. 1990) (theft as predicate of first-degree felony murder) with, *e. g.,* Ariz. Rev. Stat. Ann. § 13–1105.A (1989) (theft not such a predicate).

The question, rather, is whether felony murder may ever be treated as the equivalent of murder by deliberation, and in particular whether robbery murder as charged in this case may be treated as thus equivalent. This is in fact the very question we considered only three Terms ago in the context of our capital sentencing jurisprudence in *Tison, supra.* There we held that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents [such] a highly culpable mental state . . . that [it] may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though not inevitable, lethal result." *Id.,* at 157–158. We accepted the proposition that this disregard occurs, for example, when a robber "shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property." *Id.,* at 157. Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.[9]

---

[9] The dissent's focus on the "risks of different punishment," *post,* at 658, and n. 4, for premeditated and felony murder, ignores the fact that the Arizona sentencing statute applicable to petitioner, Ariz. Rev. Stat. Ann. § 13–453 (Supp. 1973), authorized the same maximum penalty (death) for both means of committing first-degree murder. See *McMillan* v. *Pennsylvania,* 477 U. S. 79, 87–88 (1986) (relying on fact that under Pennsylvania law possession of a weapon "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty"). Moreover, the dissent's concern that a general verdict does not provide the sentencing judge with sufficient information about the jury's

We would not warrant that these considerations exhaust the universe of those potentially relevant to judgments about the legitimacy of defining certain facts as mere means to the commission of one offense. But they do suffice to persuade us that the jury's options in this case did not fall beyond the constitutional bounds of fundamental fairness and rationality. We do not, of course, suggest that jury instructions requiring increased verdict specificity are not desirable, and in fact the Supreme Court of Arizona has itself recognized that separate verdict forms are useful in cases submitted to a jury on alternative theories of premeditated and felony murder. *State* v. *Smith*, 160 Ariz. 507, 513, 774 P. 2d 811, 817 (1989). We hold only that the Constitution did not command such a practice on the facts of this case.

## III

Petitioner's second contention is that under *Beck* v. *Alabama*, 447 U. S. 625 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder.[10] *Beck* held unconstitutional an Alabama statute that prohibited lesser in-

---

findings to provide a proper premise for the decision whether or not to impose the death penalty, *post*, at 658–659, goes only to the permissibility of a death sentence imposed in such circumstances, not to the issue currently before us, which is the permissibility of the conviction. To make the point by example, even if the trial judge in this case had satisfied any possible specific verdict concerns by instructing the jurors that they were required to agree on a single theory of the crime, the dissent's "insufficient sentencing information" concern would remain unless the judge had also taken the additional step (a step unrelated to petitioner's right to jury agreement on his specific conduct) of requiring them to return separate forms of verdict. The only relevant question for present purposes is what the jury must decide, not what information it must provide the sentencing judge.

[10] Petitioner also contends that the jury should have been instructed on the offense of theft, against which respondent argues that any claim for a lesser included theft offense instruction was waived. Given respondent's concession that petitioner has preserved his claim for a robbery instruction, and our view of the scope of *Beck*, see *infra*, at 646–648, there is no need to resolve this waiver issue.

cluded offense instructions in capital cases. Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder. While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence, and that robbery was such an offense in this case.

Petitioner misapprehends the conceptual underpinnings of *Beck*. Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. We explained:

> "[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty [in Alabama] may encourage it to acquit for an equally impermissible reason—that, whatever his crime, the defendant does not deserve death. . . . [T]hese two extraneous factors . . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Id.*, at 642 (footnote omitted).

We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. See *id.*, at 629, 630, 632, 634, 637, 642–643, and n. 19. As we later explained in *Spaziano* v. *Florida*, 468 U. S. 447, 455 (1984), "[t]he absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process

that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." See also *Hopper* v. *Evans*, 456 U. S. 605, 609 (1982). This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

Petitioner makes much of the fact that the theory of his defense at trial was not that he murdered Mr. Grove without premeditation (which would have supported a second-degree murder conviction), but that, despite his possession of some of Mr. Grove's property, someone else had committed the murder (which would have supported a theft or robbery conviction, but not second-degree murder). Petitioner contends that if the jurors had accepted his theory, they would have thought him guilty of robbery and innocent of murder, but would have been unable to return a verdict that expressed that view. Because *Beck* was based on this Court's concern about "rules that diminish the reliability of the guilt determination" in capital cases, 447 U. S., at 638, the argument runs, the jurors should have been given the opportunity "to return a verdict in conformity with their reasonable view of the evidence." Reply Brief for Petitioner 8. The dissent makes a similar argument. *Post*, at 660.

The argument is unavailing, because the fact that the jury's "third option" was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict. To accept the contention advanced by petitioner and the dissent, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that

the second-degree murder instruction in this case sufficed to ensure the verdict's reliability.

That is not to suggest that *Beck* would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence. Cf. *Roberts* v. *Louisiana*, 428 U. S. 325, 334–335 (1976) (plurality opinion). In the present case, however, petitioner concedes that the evidence would have supported a second-degree murder conviction, Brief for Petitioner 18–19, and that is adequate to indicate that the verdict of capital murder represented no impermissible choice.

The judgment of the Supreme Court of Arizona is

*Affirmed.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

The crime for which a jury in Yavapai County, Arizona, convicted Edward Harold Schad in 1985 has existed in the Anglo-American legal system, largely unchanged, since at least the early 16th century, see 3 J. Stephen, A History of the Criminal Law of England 45 (1883); R. Moreland, Law of Homicide 9–10 (1952). The common-law crime of murder was the unlawful killing of a human being by a person with "malice aforethought" or "malice prepense," which consisted of an intention to kill or grievously injure, knowledge that an act or omission would probably cause death or grievous injury, an intention to commit a felony, or an intention to resist lawful arrest. Stephen, *supra*, at 22; see also 4 W. Blackstone, Commentaries 198–201 (1769); 1 M. Hale, Pleas of the Crown 451–466 (1st Am. ed. 1847).

The common law recognized no degrees of murder; all unlawful killing with malice aforethought received the same punishment—death. See F. Wharton, Law of Homicide 147 (3d ed. 1907); Moreland, *supra*, at 199. The rigor of this rule led to widespread dissatisfaction in this country. See *McGautha* v. *California*, 402 U. S. 183, 198 (1971). In 1794,

Pennsylvania divided common-law murder into two offenses, defining the crimes thus:

"[A]ll murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree." 1794 Pa. Laws, ch. 1766, §2.

That statute was widely copied, and down to the present time the United States and most States have a single crime of first-degree murder that can be committed by killing in the course of a robbery as well as premeditated killing. See, e. g., 18 U. S. C. § 1111; Cal. Penal Code Ann. § 189 (West 1988 and Supp. 1991); Kan. Stat. Ann. § 21.3401 (Supp. 1990); Mich. Comp. Laws Ann. § 750.316 (West 1991); Neb. Rev. Stat. § 28–303 (1989).* It is Arizona's variant of the 1794 Pennsylvania statute under which Schad was convicted in 1985 and which he challenges today.

Schad and the dissenting Justices would in effect have us abolish the crime of first-degree murder and declare that the Due Process Clause of the Fourteenth Amendment requires the subdivision of that crime into (at least) premeditated murder and felony murder. The plurality rejects that course—correctly, but not in my view for the correct reason.

As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. See, e. g., People v. Sullivan, 173 N. Y. 122, 65 N. E. 989 (1903); cf. H. Joyce, Indictments §§ 561–562, pp. 654–657 (2d ed. 1924); W. Mikell, Clark's Criminal Procedure §§ 99–103,

---

*Still other States never established degrees of murder and retain a single crime of "murder" that encompasses both premeditated killing and killing in the course of a robbery. See, e. g., S. C. Code § 16–3–10 (1985).

pp. 322–330 (2d ed. 1918); 1 J. Bishop, Criminal Procedure §§ 434–438, pp. 261–265 (2d ed. 1872). That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her. While that seems perfectly obvious, it is also true, as the plurality points out, see *ante*, at 633, that one can conceive of novel "umbrella" crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process.

The issue before us is whether the present crime falls into the former or the latter category. The plurality makes heavy weather of this issue, because it starts from the proposition that "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack," *ante*, at 642–643 (internal quotation marks omitted). That is true enough, with respect to some constitutional attacks, but not, in my view, with respect to attacks under either the procedural component, see *Pacific Mut. Life Insurance Co.* v. *Haslip*, 499 U. S. 1, 28–38 (1991) (SCALIA, J., concurring in judgment), or the so-called "substantive" component, see *Michael H.* v. *Gerald D.*, 491 U. S. 110, 121–130 (1989) (plurality opinion), of the Due Process Clause. It is precisely the historical practices that *define* what is "due." "Fundamental fairness" analysis may appropriately be applied to *departures* from traditional American conceptions of due process; but when judges test their individual notions of "fairness" against an American tradition that is deep and broad and continuing, it is not the tradition that is on trial, but the judges.

And that is the case here. Submitting killing in the course of a robbery and premeditated killing to the jury under a single charge is not some novel composite that can be subjected to the indignity of "fundamental fairness" review. It was the norm when this country was founded, was the norm when the Fourteenth Amendment was adopted in 1868, and remains the norm today. Unless we are here to invent a Constitution rather than enforce one, it is impossible that a practice as old as the common law and still in existence in the vast majority of States does not provide that process which is "due."

If I did not believe that, I might well be with the dissenters in this case. Certainly the plurality provides no satisfactory explanation of why (apart from the endorsement of history) it is permissible to combine in one count killing in the course of robbery and killing by premeditation. The only point it makes is that the depravity of mind required for the two may be considered morally equivalent. *Ante,* at 643–645. But the petitioner here does not complain about lack of moral equivalence: He complains that, as far as we know, only six jurors *believed* he was participating in a robbery, and only six *believed* he intended to kill. Perhaps moral equivalence is a *necessary* condition for allowing such a verdict to stand, but surely the plurality does not pretend that it is *sufficient.* (We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the "moral equivalence" of those two acts.) Thus, the plurality approves the Arizona practice in the present case because it meets *one* of the conditions for constitutional validity. It does not say what the *other* conditions are, or why the Arizona practice meets them. With respect, I do not think this delivers the "critical examination," *ante,* at 643, which the plurality promises as a substitute for reliance upon historical practice. In fact, I think its analysis ultimately relies upon nothing but historical practice (whence does it derive even the "moral equivalence" requirement?)—

but to acknowledge that reality would be to acknowledge a rational limitation upon our power, which bobtailed "critical examination" obviously is not. "Th[e] requirement of [due process] is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process due according to the law of the land." *Walker* v. *Sauvinet*, 92 U. S. 90, 93 (1876) (citation omitted).

With respect to the second claim asserted by petitioner, I agree with JUSTICE SOUTER's analysis, and join Part III of his opinion. For these reasons, I would affirm the judgment of the Supreme Court of Arizona.

JUSTICE WHITE, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Because I disagree with the result reached on each of the two separate issues before the Court, and because what I deem to be the proper result on either issue alone warrants reversal of petitioner's conviction, I respectfully dissent.

I

As *In re Winship*, 397 U. S. 358 (1970), makes clear, due process mandates "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *Id.*, at 364. In finding that the general jury verdict returned against petitioner meets the requirements of due process, the plurality ignores the import of *Winship*'s holding. In addition, the plurality mischaracterizes the nature of the constitutional problem in this case.

It is true that we generally give great deference to the States in defining the elements of crimes. I fail to see, however, how that truism advances the plurality's case. There is no failure to defer in recognizing the obvious: that premeditated murder and felony murder are alternative courses of conduct by which the crime of first-degree murder may be established. The statute provides:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, de-

liberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years, is murder of the first degree. All other kinds of murder are of the second degree." Ariz. Rev. Stat. Ann. § 13–452 (Supp. 1973).

The statute thus sets forth three general categories of conduct which constitute first-degree murder: a "wilful, deliberate or premeditated killing"; a killing committed to avoid arrest or effect escape; and a killing which occurs during the attempt or commission of various specified felonies.

Here, the prosecution set out to convict petitioner of first-degree murder by either of two different paths, premeditated murder and felony murder/robbery. Yet while these two paths both lead to a conviction for first-degree murder, they do so by divergent routes possessing no elements in common except the fact of a murder. In his closing argument to the jury, the prosecutor himself emphasized the difference between premeditated murder and felony murder:

"There are two types of first degree murder, two ways for first degree murder to be committed. [One] is premeditated murder. There are three elements to that. One, that a killing take place, that the defendant caused someone's death. Secondly, that he do so with malice. And malice simply means that he intended to kill or that he was very reckless in disregarding the life of the person he killed.

. . . . .

"And along with the killing and the malice, attached to that killing is a third element, that of premeditation, which simply means that the defendant contemplated that he would cause death, he reflected upon that.

"The other type of first degree murder, members of the jury, is what we call felony murder. It only has two components [sic] parts. One, that a death be caused, and, two, that that death be caused in the course of a felony, in this case a robbery. And so if you find that the defendant committed a robbery and killed in the process of that robbery, that also is first degree murder." App. 6–7.

Unlike premeditated murder, felony murder does not require that the defendant commit the killing or even intend to kill, so long as the defendant is involved in the underlying felony. On the other hand, felony murder—but not premeditated murder—requires proof that the defendant had the requisite intent to commit and did commit the underlying felony. *State* v. *McLoughlin*, 139 Ariz. 481, 485, 679 P. 2d 504, 508 (1984). Premeditated murder, however, demands an intent to kill as well as premeditation, neither of which is required to prove felony murder. Thus, contrary to the plurality's assertion, see *ante*, at 639, the difference between the two paths is not merely one of a substitution of one *mens rea* for another. Rather, each contains separate elements of conduct and state of mind which cannot be mixed and matched at will.[1] It is particularly fanciful to equate

---

[1] Changes to the Arizona first-degree murder statute since the date of the murder in question make it even clearer that felony murder and premeditated murder have different elements and involve different *mentes reae*. The statute now provides that the two offenses are alternative means of establishing first-degree murder. First, a person is guilty if "[i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation." Ariz. Rev. Stat. Ann. § 13–1105.A(1) (1989). Second, a person is guilty if "[a]cting either alone or with one or more other persons such person commits or attempts to commit [any one of a series of specified felonies], and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." § 13–1105.A(2). The antecedent of the current statute, which used substantially the same

an intent to do no more than rob with a premeditated intent to murder.

Consequently, a verdict that simply pronounces a defendant "guilty of first-degree murder" provides no clues as to whether the jury agrees that the three elements of premeditated murder or the two elements of felony murder have been proved beyond a reasonable doubt. Instead, it is entirely possible that half of the jury believed the defendant was guilty of premeditated murder and not guilty of felony murder/robbery, while half believed exactly the reverse. To put the matter another way, the plurality affirms this conviction without knowing that even a single element of either of the ways for proving first-degree murder, except the fact of a killing, has been found by a majority of the jury, let alone found unanimously by the jury as required by Arizona law. A defendant charged with first-degree murder is at least entitled to a verdict — something petitioner did not get in this case as long as the possibility exists that no more than six jurors voted for any one element of first-degree murder, except the fact of a killing.[2]

The means by which the plurality attempts to justify the result it reaches do not withstand scrutiny. In focusing on

language, took effect on October 1, 1978, less then two months after the killing at issue occurred. 1977 Ariz. Sess. Laws, Ch. 142, § 60.

[2] Even the Arizona Supreme Court has acknowledged that the lack of information concerning juror agreement may call into question the validity of a general jury verdict when the prosecution proceeds under alternative theories. *State* v. *Smith,* 160 Ariz. 507, 513, 774 P. 2d 811, 817 (1989). Indeed, petitioner's first trial exemplified this danger. There the State proceeded on *three* theories: premeditated murder, felony murder/robbery, and felony murder/kidnaping. The trial judge failed to instruct the jury on either of the underlying felonies, and the Arizona Supreme Court held this to be fundamental error. 142 Ariz. 619, 620, 691 P. 2d 710, 711 (1984). Petitioner's conviction was reversed because it was impossible to tell from the general jury verdict whether petitioner had been found guilty of premeditated murder or felony murder, for which the instructions had been deficient. *Id.,* at 621, 691 P. 2d, at 712. Cf. *Sandstrom* v. *Montana,* 442 U. S. 510, 526 (1979).

our vagueness cases, see *ante*, at 632–633, the plurality misses the point. The issue is not whether the statute here is so vague that an individual cannot reasonably know what conduct is criminalized. Indeed, the statute's specificity renders our vagueness cases inapplicable. The problem is that the Arizona statute, under a single heading, criminalizes several alternative patterns of conduct. While a State is free to construct a statute in this way, it violates due process for a State to invoke more than one statutory alternative, each with different specified elements, without requiring that the jury indicate on which of the alternatives it has based the defendant's guilt.

The plurality concedes that "nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." *Ante*, at 633. But this is very close to the effect of the jury verdict in this case. Allowing the jury to return a generic verdict following a prosecution on two separate theories with specified elements has the same effect as a jury verdict of "guilty of crime" based on alternative theories of embezzlement or reckless driving. Thus the statement that "[i]n Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder," *State* v. *Encinas*, 132 Ariz. 493, 496, 647 P. 2d 624, 627 (1982), neither recognizes nor resolves the issue in this case.

The plurality likewise misses the mark in attempting to compare this case to those in which the issue concerned proof of facts regarding the particular means by which a crime was committed. See *ante*, at 631–632. In the case of burglary, for example, the manner of entering is not an element of the crime; thus, *Winship* would not require proof beyond a reasonable doubt of such factual details as whether a defendant pried open a window with a screwdriver or a crowbar.

It would, however, require the jury to find beyond a reasonable doubt that the defendant in fact broke and entered, because those are the "fact[s] necessary to constitute the crime." 397 U. S., at 364.[3]

Nor do our cases concerning the shifting of burdens and the creation of presumptions help the plurality's cause. See ante, at 638–639. Although this Court consistently has given deference to the State's definition of a crime, the Court also has made clear that having set forth the elements of a crime, a State is not free to remove the burden of proving one of those elements from the prosecution. For example, in *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), the Court recognized that "under Montana law, whether the crime was committed purposely or knowingly is a fact necessary to constitute the crime of deliberate homicide," and stressed that the State therefore could not shift the burden of proving lack of intent to the defendant. *Id.*, at 520–521. Conversely, in *Patterson* v. *New York*, 432 U. S. 197, 205–206 (1977), the Court found that it did not violate due process to require a defendant to establish the affirmative defense of extreme emotional disturbance, because "[t]he death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred in order to constitute the crime." Here, the question is not whether the State "must be permitted a degree of flexibility" in defining the elements of the offense. See ante, at 638. Surely it is entitled to that deference. But having determined that premeditated murder and felony murder are separate paths to establishing first-degree murder, each containing a separate set of elements from the other, the State must

---

[3] For similar reasons, the plurality's focus on the statutorily enumerated means of satisfying a given element of an offense, see ante, at 636, n. 6, is misplaced.

be held to its choice.[4]   Cf. *Evitts* v. *Lucey*, 469 U. S. 387, 401 (1985).   To allow the State to avoid the consequences of its legislative choices through judicial interpretation would permit the State to escape federal constitutional scrutiny even when its actions violate rudimentary due process.

The suggestion that the state of mind required for felony murder/robbery and that for premeditated murder may reasonably be considered equivalent, see *ante*, at 644, is not only unbelievable, but it also ignores the distinct consequences that may flow from a conviction for each offense at sentencing.   Assuming that the requisite statutory aggravating circumstance exists, the death penalty may be imposed for premeditated murder, because a conviction necessarily carries with it a finding that the defendant intended to kill.   See Ariz. Rev. Stat. Ann. § 13–703 (1989).   This is not the case with felony murder, for a conviction only requires that the death occur during the felony; the defendant need not be proved to be the killer.   Thus, this Court has required that in order for the death penalty to be imposed for felony murder, there must be a finding that the defendant in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used, *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982), or that the defendant was a major participant in

---

[4] Even if the crime of first-degree murder were generic, that different categories of the offense carry risks of different punishment is constitutionally significant.   In *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975), for example, this Court concluded that the absence of "heat of passion on sudden provocation," while not an expressly stated element of the offense of "homicide," was essential to reduce the punishment category of the crime from that of murder to manslaughter.   *Id.*, at 697, 699.   Consequently, the State there violated *In re Winship*, 397 U. S. 358 (1970), and principles of due process by requiring the defendant to establish the absence of the intent required for murder, and thereby rebut the presumption of malice.   *Mullaney, supra*, at 703–704.   As discussed below, the disparate intent requirements of premeditated murder and felony murder have life-or-death consequences at sentencing.

the felony and exhibited reckless indifference to human life, *Tison* v. *Arizona*, 481 U. S. 137, 158 (1987).

In the instant case, the general verdict rendered by the jury contained no finding of intent or of actual killing by petitioner. The sentencing judge declared, however:

> "[T]he court does consider the fact that a felony murder instruction was given in mitigation, however there is not evidence to indicate that this murder was merely incidental to a robbery. The nature of the killing itself belies that. . . .
>
> "The court finds beyond a reasonable doubt that the defendant attempted to kill Larry Grove, intended to kill Larry Grove and that defendant did kill Larry Grove.
>
> "The victim was strangled to death by a ligature drawn very tightly about the neck and tied in a double knot. No other reasonable conclusion can be drawn from the proof in this case, notwithstanding the felony murder instruction." Tr. 8–9 (Aug. 29, 1985).

Regardless of what the jury actually had found in the guilt phase of the trial, the sentencing judge believed the murder was premeditated. Contrary to the plurality's suggestion, see *ante*, at 644–645, n. 9, the problem is not that a general verdict fails to provide the sentencing judge with sufficient information concerning whether to impose the death sentence. The issue is much more serious than that. If in fact the jury found that premeditation was lacking, but that petitioner had committed felony murder/robbery, then the sentencing judge's finding was in direct contravention of the jury verdict. It is clear, therefore, that the general jury verdict creates an intolerable risk that a sentencing judge may subsequently impose a death sentence based on findings that contradict those made by the jury during the guilt phase, but not revealed by their general verdict. Cf. *State* v. *Smith*, 160 Ariz. 507, 513, 774 P. 2d 811, 817 (1989).

## II

I also cannot agree that the requirements of *Beck* v. *Alabama*, 447 U. S. 625 (1980), were satisfied by the instructions and verdict forms in this case. *Beck* held that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.*, at 637. The majority finds *Beck* satisfied because the jury here had the opportunity to convict petitioner of second-degree murder. See *ante*, at 646–648. But that alternative provided no "third option" to a choice between convicting petitioner of felony murder/robbery and acquitting him completely, because, as the State concedes, see Tr. of Oral Arg. 51–52, second-degree murder is a lesser included offense only of premeditated murder. Thus, the Arizona Supreme Court has declared that "'[t]he jury may not be instructed on a lesser degree of *murder* than first degree where, under the evidence, it was committed in the course of a robbery.'" *State* v. *Clayton,* 109 Ariz. 587, 595, 514 P. 2d 720, 728 (1973), quoting *State* v. *Kruchten,* 101 Ariz. 186, 196, 417 P. 2d 510, 520 (1966), cert. denied, 385 U. S. 1043 (1967) (emphasis added). Consequently, if the jury believed that the course of events led down the path of felony murder/robbery, rather than premeditated murder, it could not have convicted petitioner of second-degree murder as a legitimate "third option" to capital murder or acquittal.

The State asserts that felony murder has no lesser included offenses.[5] In order for a defendant to be convicted of fel-

---

[5] Arizona law has not been consistent on this point. Arizona cases have long said that "there is no lesser included *homicide* offense of the crime of felony murder since the *mens rea* necessary to satisfy the premeditation element of first degree murder is supplied by the specific intent required for the felony." *State* v. *Arias,* 131 Ariz. 441, 444, 641 P. 2d 1285, 1288

ony murder, however, there must be evidence to support a conviction on the underlying felony, and the jury must be instructed as to the elements of the underlying felony. Although the jury need not find that the underlying felony was completed, the felony murder statute requires there to be at least an attempt to commit the crime. As a result, the jury could not have convicted petitioner of felony murder/robbery without first finding him guilty of robbery or attempted robbery.[6] Indeed, petitioner's first conviction was reversed *because* the trial judge had failed to instruct the jury on the elements of robbery. 142 Ariz. 619, 691 P. 2d 710 (1984). As the Arizona Supreme Court declared: "Fundamental error is present when a trial judge fails to instruct on matters vital to a proper consideration of the evidence. Knowledge of the elements of the underlying felonies was vital for the jurors to properly consider a felony murder theory." *Id.*, at 620–621, 691 P. 2d, at 711–712 (citation omitted).

It is true that the rule in *Beck* only applies if there is in fact a lesser included offense to that with which the defendant is charged, for "[w]here no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process." *Spaziano* v. *Florida*, 468 U. S. 447, 455 (1984). But while deference is due state legislatures and courts in defining crimes, this deference has constitutional limits. In the case of a compound

---

(1982) (emphasis added). Recent cases have omitted the crucial word "homicide." See, *e. g.*, *State* v. *LaGrand*, 153 Ariz. 21, 29–30, 734 P. 2d 563, 571–572, cert. denied, 484 U. S. 872–873 (1987).

[6] In this Court's recent decision in *Schmuck* v. *United States*, 489 U. S. 705 (1989), we adopted the "elements" test for defining "necessarily included" offenses for purposes of Federal Rule of Criminal Procedure 31(c). "Under this test, one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense." *Schmuck*, *supra*, at 716. See also *Berra* v. *United States*, 351 U. S. 131, 134 (1956). Here that test is met, for petitioner could not be convicted of felony murder/robbery unless the jury found that a robbery, or an attempt to commit robbery, had occurred.

crime such as felony murder, in which one crime must be proved in order to prove the other, the underlying crime must, as a matter of law, be a lesser included offense of the greater.

Thus, in the instant case, robbery was a lesser included offense of the felony murder/robbery for which petitioner was tried. The Arizona Supreme Court acknowledged that "the evidence supported an instruction and conviction for robbery," had robbery been a lesser included offense of felony murder/robbery. 163 Ariz. 411, 417, 788 P. 2d 1162, 1168 (1989). Consequently, the evidence here met "the independent prerequisite for a lesser included offense instruction that the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *Schmuck* v. *United States*, 489 U. S. 705, 716, n. 8 (1989); see *Keeble* v. *United States*, 412 U. S. 205, 208 (1973). Due process required that the jury be given the opportunity to convict petitioner of robbery, a necessarily lesser included offense of felony murder/robbery. See *Stevenson* v. *United States*, 162 U. S. 313, 319–320 (1896).

Nor is it sufficient that a "third option" was given here for one of the prosecution's theories but not the other. When the State chooses to proceed on various theories, each of which has lesser included offenses, the relevant lesser included instructions and verdict forms on *each* theory must be given in order to satisfy *Beck*. Anything less renders *Beck*, and the due process it guarantees, meaningless.

With all due respect, I dissent.