Opinion issued October 23, 2008









Opinion issued
October 23, 2008

 

 

 













 

     

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-07-00503-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



STEVEN MICHAEL SHERRILL, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 263rd District Court

Harris County, Texas

Trial Court Cause No. 1068120

 








 

 

 

 



MEMORANDUM OPINION

          Appellant, Steven Michael
Sherrill, pleaded not guilty to the capital murder of Christine Van Osdall.  See
Tex. Penal Code Ann. §
19.03(a)(2) (Vernon 2005).  The jury found Sherrill guilty, and the State
having not sought the death penalty, the trial court sentenced him to life
imprisonment.  Sherrill contends the trial court violated his constitutional
rights by submitting a disjunctive jury charge.  He further contends the
evidence is legally and factually insufficient to support the verdict.  We conclude
that the trial court did not err and that the evidence supports the verdict. 
We therefore affirm.

Background

          In the fall of 1999,
Christine Van Osdall met Sherrill through a dating service.  They began dating
in November 1999.  At the end of January 2000, Van Osdall expressed concerns to
two of her friends that their relationship was progressing too quickly.  Van
Osdall decided to break up with Sherrill but was worried because he had told
her he would kill himself if she broke up with him.

          On February 3, Van Osdall
consulted a social worker, Meg Scott, about ways to safely end the
relationship.  Scott testified that Van Osdall was not ambivalent about wanting
to end the relationship.  Scott recommended that Van Osdall write Sherrill a
letter expressing her concerns.  Van Osdall took notes about what to tell
Sherrill.  When she returned home that day, she showed the notes to her roommate,
Mary Jo Alberto.  Van Osdall then telephoned Sherrill in Alberto’s presence and
read the letter to him.  Sherrill convinced Van Osdall to go to his house to
talk in person after she had finished a dinner in celebration of her mother’s
birthday.  Because Alberto had a bad feeling about Van Osdall going to
Sherrill’s apartment, she requested Sherrill’s phone number and address.  She
also made a plan with Van Osdall that when Van Osdall returned home that night,
she would turn off the kitchen light so that Alberto would know she had been
home.  Van Osdall did not ask Alberto to take care of her dog, which she had
always done in the past if she planned to spend the night away from home.

          Van Osdall had dinner with
her family and dropped her aunt off at 9:15 P.M.  She left a voicemail for
Sherrill stating that she was on her way over.  Sherrill called his supervisor
at work and told him that he was working things out with his girlfriend and
would not be able to work his scheduled 11:00 P.M. to 7:00 A.M. shift.  Around
2:30 A.M., Alberto awoke and realized that Van Osdall had not turned off the
kitchen light as they had planned.  Alberto telephoned both Sherrill and Van
Osdall, but did not receive an answer.  She left a message saying that Van
Osdall’s dog was sick, in hopes that if Van Osdall checked it, she would call
her back.  Later that morning, Alberto drove to Sherrill’s apartment complex
and saw Sherrill’s car in the parking lot but not Van Osdall’s car.  That day,
she filed a missing person’s report with the Harris County Constable.

          That same afternoon, Moises
Murillo was fishing with some family members near Addicks Reservoir when he
found Van Osdall’s body under a blue tarp in the woods.  They went to the
police station to report it and then returned to the reservoir to help locate
her body.  They were unable to find her body that night but returned the next
day, at which time he lead police to her body.  Van Osdall’s body had been
covered with dirt and debris, apparently in an attempt to hide it.  She wore a
denim dress, and her panties were missing.  She had suffered a gunshot wound to
the head.  The officers saw what appeared to be dried semen on her thigh,
although this was not preserved for later testing.  Ligature marks appeared on
her right hand and wrist, and fishing line was tied to her left wrist.  Using a
metal detector, Sergeant Davila located a fired 9mm bullet near her body.

          Van Osdall’s roommate,
Alberto, identified Van Osdall and informed the detectives about Van Osdall’s
plans on the night she disappeared.  Sergeants Binford and Allen went to
Sherrill’s apartment on Sunday evening to interview him.  The sergeants
testified that when they arrived, Sherrill acted agitated and irritated, failed
to keep eye contact, and crossed his arms.  He did not ask any questions about
what had happened when they told him that Van Osdall was dead.  Sherrill
consented to a search of his apartment.  Allen found small amounts of leaves
and twigs in Sherrill’s apartment and collected them.  Sherrill accompanied the
officers to the police station where he gave written consent for hair and
saliva samples and fingernail clippings.  The detectives noted that Sherrill’s
fingernails were dirty, which they felt was significant since there had been an
attempt to cover Van Osdall’s body with dirt and debris.  Before the detectives
could collect fingernail scrapings from Sherrill, he stated that he was tired
and ready to return home.  When they returned to Sherrill’s apartment, he
allowed the detectives to listen to his voicemail, which contained a message
from Van Osdall stating she was on her way to his apartment, as well as a
message from Alberto stating the Van Osdall’s dog was sick.  Sherrill agreed to
meet the detectives the following day before they left.

          The next morning, when the
detectives arrived at Sherrill’s apartment, he was not there.  Sherrill had
briefly visited his brother early that morning and had withdrawn $1400 from his
bank account.  The police did not learn of Sherrill’s whereabouts again until
2005, when they discovered that he was back in Houston.  During his more than
five-year absence, Sherrill wrote letters to his daughter, in which he told her
not to let anyone know she was talking to him, to use a different email
address, and to be careful when talking on the telephone.  Sherrill also asked
his brother to find out whether any warrants had been issued for his arrest. 
Detectives later learned that Sherrill had moved to Las Vegas and then met a
woman on the internet who lived in Montana.  He moved in with her in Helena, Montana, giving her a false name and background. 

          The detectives continued
investigating Van Osdall’s murder during Sherrill’s absence.  On March 20,
2000, police located Van Osdall’s car in an apartment complex parking lot near
the Greenspoint area.  The car had been driven with a key since the steering
column was still intact.  One witness stated that he had seen a young, black
male driving the car but the police were unable to locate who that person might
have been.  Sherrill’s thumbprint matched a fingerprint investigators found on
the passenger seat belt.

          In April 2000, after Sherrill’s
apartment complex had left several notices to vacate on Sherrill’s door,
Sergeant Allen returned to Sherrill’s apartment and searched it.  Sherrill had
abandoned the apartment, leaving clothes and furniture.  Allen found a pair of
white panties in Sherrill’s drawers.  The DNA on these panties later matched
Van Osdall’s DNA.  Allen also found some blood in Sherrill’s sink which was
later determined to be Sherrill’s blood.

          During their investigation,
the detectives interviewed Richard Holley, who previously worked with
Sherrill.  Holley testified that he had sold Sherrill a Lorcin 9mm handgun in
1998.  Ballistics tests determined that the bullet that killed Van Osdall had
been fired from one of four types of guns, including a Lorcin semi-automatic. 

          Without any further leads,
the investigation halted until 2005 when Sergeant Mehl, who was part of the
cold case squad, re-opened the case.  Mehl located the physical evidence from
the case and realized that much of it had not been tested.  Mehl sent a pubic
hair that had been found on Van Osdall’s sock for DNA testing.  DNA analysis
determined that Sherrill’s mitochondrial DNA matched that of the hair, but the
hair could not be positively identified as Sherrill’s, because anyone in his
maternal line would have matched it.  Mehl testified that in his opinion, the
hair was deposited on her sock at the crime scene because he did not think it
would have remained on her sock for the walk through the vegetation to the
crime scene.  Mehl also had Van Osdall’s dress tested for the presence of
semen.  He believed that the dress may have rubbed the semen off her leg that
investigators had seen at the scene.  Two DNA profiles were found on the dress:
the epithelial sample matched Van Osdall’s DNA and the sperm fraction matched
Sherrill’s DNA.

          Mehl also contacted Dr.
Larry Brown of the Spring Branch Science Center Herbarium to examine the leaf Sergeant
Allen had collected from Sherrill’s bedroom floor.  Brown testified that the
leaf was from a cedar elm tree, which is a tree found in areas prone to
flooding.  Mehl took Brown to the crime scene in Addicks Reservoir, where he
found a cedar elm tree about twenty feet where Van Osdall’s body had been. 
Mehl also took Brown to Sherrill’s apartment complex to see if any similar
trees were located there.  Brown testified that no cedar elms were planted in
or around Sherrill’s apartment.  He reasoned that this was because cedar elms
are not generally used for domestic landscaping.  Mehl arrested Sherrill in
2005.  Sherrill did not present any evidence at trial.

Sufficiency of the Evidence

          In his fifth and sixth
issues, Sherrill contends that the evidence is legally and factually
insufficient to support a finding that he caused the death of Van Osdall.  We
note that Sherrill does not challenge the sufficiency of the evidence to
support the finding that the murder occurred while in the course of committing
or attempting to commit kidnapping or sexual assault.

Standard of Review

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175
S.W.3d 795, 798 (Tex. Crim. App. 2005).  The standard is the same for both
direct and circumstantial evidence cases.  King v. State, 895 S.W.2d
701, 703 (Tex. Crim. App. 1995).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999); Adelman v. State, 828 S.W.2d 418, 421 (Tex.
Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App.
1991).  

When evaluating factual sufficiency,
we consider all the evidence in a neutral light to determine whether the jury
was rationally justified in finding guilt beyond a reasonable doubt.  Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We set the verdict
aside only if (1) the evidence is so weak that the verdict is clearly wrong and
manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  Under the first prong of Johnson, we cannot conclude that a
verdict is “clearly wrong” or “manifestly unjust” simply because, on the
quantum of evidence admitted, we would have voted to acquit had we been on the
jury.  Watson, 204 S.W.3d at 417.  Under the second prong of Johnson,
we cannot declare that a conflict in the evidence justifies a new trial simply
because we disagree with the jury’s resolution of that conflict.  Id.  Before finding that evidence is factually insufficient to support a verdict under
the second prong of Johnson, some objective basis in the record must
demonstrate that the great weight and preponderance of the evidence contradicts
the jury’s verdict.  Id.  

Capital Murder

A person commits capital murder “if
the person commits murder as defined under Section 19.02(b)(1) and the person
intentionally commits the murder in the course of committing or attempting to
commit kidnapping, burglary, robbery, aggravated sexual assault, arson,
obstruction or retaliation, or terroristic threat.”  Tex. Penal Code Ann. § 19.03(a)(2).  Murder is defined as
“intentionally or knowingly caus[ing] the death of an individual.  Id. §19.03(b)(1).

Sufficiency of the evidence

          In reviewing the
sufficiency of the evidence, we examine “events occurring before, during and
after the commission of the offense.”   Cordova v. State, 698 S.W.2d
107, 111 (Tex. Crim. App. 1985).  “Each fact need not point directly and
independently to the guilt of the appellant, as long as the cumulative effect of
all the incriminating facts are [sic] sufficient to support the conviction.” Guevara
v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  

The last place Van Osdall appeared
alive was Sherrill’s apartment.  Sherrill admitted to detectives that he had
seen her that night.  The State presented testimony from numerous sources that
Van Osdall intended to end her relationship with Sherrill on the night she
died, thus establishing his motive for murdering her.  Id. at 50.  (“Motive
is a significant circumstance indicating guilt.”).  Sherrill contends that Van
Osdall ending their relationship is not motive because “it is no more specific
to appellant than to any person ending a relationship.”  The State, however,
also presented testimony that Sherrill was possessive of Van Osdall and had
threatened to kill himself if she ended the relationship.  

The State also presented evidence
that Sherrill had purchased one of the four types of guns that fires the type
of bullet that killed Van Osdall.  The detectives found a leaf in Sherrill’s
bedroom from the type of tree located near Van Osdall’s body—a tree that is not
located in or around Sherrill’s apartment complex.  Van Osdall was not wearing
panties when police discovered her body, and the detectives found a pair of Van
Osdall’s panties in Sherrill’s apartment.  Furthermore, Sherrill’s DNA matched
the sperm that detectives found on the dress Van Osdall wore when her body was
found in the forest, and his DNA is consistent with the pubic hair found on Van
Osdall’s sock.  Detectives also found Sherrill’s fingerprint in Van Osdall’s
car.  Sherrill contends that this evidence could have been left before the
murder, and he emphasizes that the model of his gun is common.  He asserts that
he and Van Osdall had consensual sex when she visited him at his apartment,
which explains his DNA on her body.  Contrary to that assertion, the State
presented testimony that Van Osdall’s arms had been tied with fishing line and
that she was very determined to end her relationship when she went to
Sherrill’s apartment that night.  Furthermore, Detective Mehl testified that he
did not believe the pubic hair that the investigators found would have remained
on Van Osdall’s sock through a walk in the woods, if she had indeed had sexual
intercourse before walking out there.  

The State presented additional
evidence that Sherrill left Texas soon after speaking with detectives.  He told
his daughter to be careful not to tell anyone that he was emailing her.  He
used an alias when living with a woman in Montana.  In addition, he called his
brother to check whether police had issued any warrants for his arrest.  The
jury reasonably could have inferred that Sherrill fled the State because he was
guilty.  See Felder v. State, 848 S.W.2d 85, 98 (Tex. Crim. App. 1992)
(holding that fact that appellant provided police officer with false
identification indicates “consciousness of guilt”); Foster
v. State, 779 S.W.2d 845, 859 (Tex. Crim. App.
1989) (“Evidence of flight is admissible as a
circumstance from which an inference of guilt may be drawn.”); Robinson
v. State, 236 S.W.3d 260, 268 (Tex. App.—Houston [1st Dist.] 2007, pet.
denied) (holding that flight and use of fake name shows consciousness of
guilt).  

We defer to “the responsibility of
the trier of fact to fairly resolve conflicts in testimony, to weigh the
evidence, and to draw reasonable inferences from basic facts to ultimate
facts.”  Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)
(quoting Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781. 2788–89 (1979)).  “Each fact need not point directly and independently to the guilt
of the appellant, as long as the cumulative force of all the incriminating
circumstances is sufficient to support the conviction.”  Id.  Viewing
the evidence in a light favorable to the jury’s verdict, we hold that legally
sufficient evidence supports the jury’s verdict.  Although Sherrill offers
alternative explanations for the evidence that the State presented, the jury is
ultimately responsible for weighing the evidence and drawing reasonable
inferences from that evidence.  Considering the totality of the
evidence—motive, the DNA evidence, the leaf in Sherrill’s apartment, Van
Osdall’s panties in his apartment, and Sherrill’s flight from Texas—we hold
that, when viewed neutrally, the jury’s verdict is not against the great weight
and preponderance of the evidence.  We therefore conclude that the evidence is
legally and factually sufficient to support the verdict.

Jury Charge

In his first three issues,
Sherrill contends that his Fourteenth Amendment right of due process and his
Sixth Amendment right of trial by jury were violated because the trial court’s
charge did not require the jury to unanimously agree whether the offense
elevating murder to capital murder was kidnapping or sexual assault.[1] 
In his fourth issue, Sherrill contends that he was egregiously harmed by this
error.

Standard of Review

Texas requires unanimous verdicts in all felony
cases.  See Tex. Const.
art. V, § 13; Stuhler v. State, 218 S.W.3d 706, 716 (Tex. Crim. App. 2007); Ngo v. State, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005).
Appellate review of jury charge error involves a two-step process.  Abdnor
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must
determine whether error occurred.  If so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  Id. at 731–32.  When, as here, an appellant did not object to the charge at trial, he is
entitled to reversal only if he can show egregious harm.  See Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

Analysis

Sherrill contends that his
constitutional rights were violated because the jury was not required to
unanimously agree on which aggravating offense (i.e., kidnapping or aggravated
sexual assault) elevated his crime to capital murder.  The thrust of Sherrill’s
argument is that the aggravating offenses enumerated in section 19.03(a)(2) are
separate elements of the offense of capital murder, not merely alternate means
of committing capital murder.  As such, Sherrill contends, the jury should not
have been permitted to find him guilty of capital murder without agreeing
unanimously on at least one particular offense enumerated in section
19.03(a)(2).

The indictment charged Sherrill with
capital murder, which is defined in relevant part as “intentionally
commit[ting] . . . murder in the course of committing or attempting to commit
kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or
retaliation, or terroristic threat.”  Tex.
Penal Code Ann. § 19.03(a)(2) (Vernon 2005).  The indictment alleged:

STEVEN MICHAEL SHERRILL . . . on or about February 4,
2000, did then and there unlawfully, while in the course of committing and
attempting to commit the KIDNAPPING of CHRISTINE VAN OSDALL, intentionally
cause the death of CHRISTINE VAN OSDALL by SHOOTING CHRISTINE VAN OSDALL WITH A
DEADLY WEAPON, NAMELY A FIREARM.

 

It is further presented that . . . STEVEN MICHAEL
SHERRILL . . . on or about February 4, 2000, did then and there unlawfully,
while in the course of committing and attempting to commit the AGGRAVATED
SEXUAL ASSAULT of CHRISTINE VAN OSDALL, intentionally cause the death of
CHRISTINE VAN OSDALL by SHOOTING CHRISTINE VAN OSDALL WITH  A DEADLY WEAPON,
NAMELY A FIREARM.

 

The trial court instructed the jury:
“If you find from the evidence . . . the defendant, Steven Michael Sherrill,
did then and there unlawfully, while in the course of committing or attempting
to commit the kidnapping of Christine Van Osdall, intentionally cause [her]
death . . . or if you find from the evidence that . . . Steven Michael Sherrill,
did then and there unlawfully, while in the course of committing or attempting
to commit the aggravated sexual assault of Christine Van Osdall, intentionally
cause [her] death . . . then you will find the defendant guilty of capital
murder.”

In reviewing a disjunctive jury
charge, we first determine whether the separate application paragraphs contain
different criminal acts or whether they merely instruct as to different means
of committing a single offense.  If the disjunctive paragraphs contain
different criminal acts, then the jury must be instructed that it cannot return
a guilty verdict unless it agrees unanimously that the defendant committed one
of the acts.  Ngo v. State, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005).  If
the disjunctive paragraphs merely inform of different means of committing a
single offense, then the jury does not have to unanimously agree on which
alternative means the defendant used to commit the offense.  Kitchens v.
State, 823 S.W.2d 256 (Tex. Crim. App. 1991).  In determining whether the
paragraphs are separate criminal acts or separate means of committing one act, “[a]
handy, though not definitive, rule of thumb is to look to the statutory verb
defining the criminal act.”  Ngo, 175 S.W.3d at 745 n. 24.

This case is similar to Kitchens,
in which the jury charge presented two alternative theories of capital murder—one
in the course of aggravated assault and the other in the course of robbery.  Kitchens,
823 S.W.2d 256.  The Texas Court of Criminal Appeals held that if alternative
theories of the same offense are submitted to the jury in the disjunctive, then
the jury may return a general verdict if the evidence supports a finding under
any of the theories submitted.  Id. at 258.  No general requirement
exists that the jury reach agreement on the preliminary factual issues that
underlie the verdict.  Id. at 258.  Likewise, in Schad v. Arizona,
the United States Supreme Court concluded that it is not unconstitutional to
instruct a federal jury that it could find a defendant guilty of felony murder
or premeditated murder within a single guilty verdict form. Schad v. Arizona, 501 U.S. 624, 642–44, 111 S. Ct. 2491, 2502–03 (1991). 

Sherrill contends that the holding in
Kitchens has been eroded by Ngo v. State, 175 S.W.3d 738 (Tex. Crim.
App. 2005), and by Richardson v. United States, 526 U.S. 813, 119 S. Ct. 1707 (1999).  In Ngo, the court held that because the defendant was
charged with three different types of credit card abuse, the jury had to
unanimously agree that the defendant committed at least one of three different acts:
he had to have stolen the credit card, knowingly received the stolen credit
card, or fraudulently presented the stolen credit card with intent to obtain a benefit. 
Ngo, 175 S.W.3d at 744.  In Richardson, the Supreme Court held
that the federal continuing criminal enterprise statute requires jurors to agree
unanimously upon which acts—or drug sales—the defendant committed.  In so
holding, the Court confirmed that a jury in a robbery case does not have to agree
on the underlying facts, such as whether the defendant used a knife or a gun to
create a threat, as long as it agrees that the defendant threatened to use
force.  Id. at 817, 119 S. Ct. at 1711.  Unlike Ngo and Richardson,
which both potentially involve more than one offense, the disjunctive paragraphs
in this case, as in Kitchens and Schad, concern only one actus
reus—the murder of Van Osdall.  The Ngo decision, therefore, does not
erode the holding of Kitchens in cases in which the defendant is charged
with the specific offense of capital murder.

To obtain a capital murder conviction
against Sherrill, the State was required to prove beyond a reasonable doubt
that he intentionally caused Van Osdall’s death while in the course of kidnapping
or attempting to kidnap Van Osdall or while in the course of committing or
attempting to commit the aggravated sexual assault of Van Osdall.  See Tex. Penal Code Ann. §  19.03(a)(2).
 We follow the Court of Criminal Appeals’ holding in Kitchens and hold
that these are alternative means of committing the capital murder that the
State alleged in the indictment, and thus, the jury could convict appellant
under either theory.  Guevara v. State, 152 S.W.3d 45, 52 (Tex. Crim. App.
2004) (citing Kitchens, 823 S.W.2d at 258) (“[W]hen multiple
theories are submitted to the jury, the evidence is sufficient to support a
conviction so long as the evidence is sufficient to support conviction for one
of the theories submitted to the jury.”); see also Aguirre v. State, 732
S.W.2d 320, 326 (Tex. Crim. App. 1987) (“Because appellant’s indictment did not
allege different offenses but only alleged different ways of committing the
same offense, the court properly furnished the jury with a general verdict form.”);
Holford v. State, 177 S.W.3d 454, 463 (Tex. App.—Houston [1st Dist.] 2005,
pet ref’d) (holding that trial court did not err in failing to instruct jury
that it must agree unanimously on manner of complainant’s murder when its
instructions required jury to agree on single act of capital murder).  

Sherrill also relies on the Supreme
Court’s holdings in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct.
2348 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002), to support his contention that his right to a jury trial was violated when
the jury did not unanimously decide which aggravating factor Sherrill
committed.  This case is distinguishable from Apprendi and Ring
because in those cases, the trial court, instead of the jury, found specific
aggravating factors which the Supreme Court determined should have been decided
by the jury.  In this case, however, the jury, not the trial court, determined
that Sherrill committed murder while committing kidnapping or aggravated sexual
assault.  Sherrill thus received a jury trial on the aggravating factor that
elevated murder to capital murder.

We hold that the trial court did not
err in submitting a disjunctive jury charge with a general verdict for the
single offense of capital murder, and therefore, Sherrill’s conviction does not
violate his right to due process, due course of law, or to a jury trial.[2]

Conclusion

We hold that the trial court did not
err in submitting a disjunctive jury charge.  We further hold that the evidence
is legally and factually sufficient to support the verdict.  We therefore
affirm the judgment of the trial court.

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Justices Jennings, Hanks,
and Bland.

Do not publish.  Tex. R. App. P. 47.4.









[1]Although Sherrill’s first claim is predicated on both
the Fourteenth Amendment and the Sixth Amendment, the right of juror unanimity
“is more accurately characterized as a due process right than as one under the
Sixth Amendment.” Manns v. Quarterman, 236 Fed. App’x 908, 913 (5th
Cir. 2007), citing Schad v. Arizona, 501 U.S. 624, 634 n.5, 111 S. Ct. 2491 (1991) (plurality opinion)). 





[2] Having held that no jury charge error exists, we do
not reach Sherrill’s fourth issue that he was egregiously harmed.