# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 22, 2014 Session

## STATE OF TENNESSEE v. JOSEPH SCOTT MORRELL

**Appeal from the Criminal Court for Washington County**
**No. 38722     Stacy Street, Judge**

_____

**No. E2013-02431-CCA-R3-CD - Filed October 7, 2014**

_____

The defendant, Joseph Scott Morrell, appeals his Washington County Criminal Court jury conviction of third offense driving under the influence ("DUI"), claiming that the evidence was insufficient to support his conviction, that the verdict of the jury was not unanimous, and that the trial court should have dismissed the indictment or declared a mistrial following the State's improper commentary during closing argument. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and TIMOTHY L. EASTER, SP. J., joined.

Gene G. Scott, Jr., Jonesborough, Tennessee, for the appellant, Joseph Scott Morrell.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Tony Clark, District Attorney General; and Justin Irick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At the defendant's October 1, 2013 jury trial, Washington County Sheriff's Officer David Cate testified that at 12:53 a.m. on May 31, 2012, he "was dispatched to Arrow Jet for a person that appeared to be passed out in a vehicle in the parking lot." When he arrived, he "observed a vehicle with a subject that appeared to be passed out in the vehicle." Officer Cate approached the vehicle and discovered the defendant asleep in the driver's seat. He noted that the keys were in the ignition and that the defendant appeared to be "kind of leaned towards the passenger's side." He said the defendant was not lying "straight back." Officer Cate knocked on the window, and, after "a minute," the defendant

woke up. Officer Cate testified that the defendant "seemed confused," that "[h]e had red bloodshot watery eyes," and that "an odor of an alcoholic beverage" was "coming from his person." Officer Cate said that when asked whether he had been drinking, the defendant replied with slurred speech that "he had a few beers." The defendant told the officer that he had been "at a friend's house" and that he had driven to that location. Officer Cate said that the defendant was the only person in the car.

Officer Cate testified that at that point, he asked the defendant to step out of the car. As he exited the vehicle, the defendant "dropped his wallet . . . and he just seemed unsteady on his feet." Officer Cate asked the defendant to perform field sobriety tests, and the defendant responded "that he had back and leg problems, but he said he would do the tests." He could not recall whether the defendant had a cane with him that night. Officer Cate said that he had no camera in his cruiser to record the field sobriety tests because his camera had been sent for repairs. During the instruction phase of the walk-and-turn test, the defendant was unable to maintain his balance. During the test itself, the defendant "didn't use heel to toe. He stepped off the line. He used his arms for balance and on the ninth step he stopped and asked what to do." During the one-legged-stand test, the defendant put his foot down too soon, used his arms for balance, and hopped on one foot.

At that point, Officer Cate placed the defendant under arrest and had the defendant's vehicle towed to the police impound area. After being advised of his right to refuse blood alcohol testing, the defendant agreed to allow his blood to be drawn for the purpose of blood alcohol testing. Toxicology testing performed by the Tennessee Bureau of Investigation ("TBI") established the presence of alprazolam, oxycodone, methadone, and alcohol in the defendant's blood. The defendant's blood alcohol level was .06 percent.

Officer Cate testified that the defendant stated that he had driven to the Arrow Jet and did not say that he had been driven to that location by another party. He said that the defendant did not tell him that the car was not operational. When asked where he was going, the defendant "said he was going home."

During cross-examination, Officer Cate testified that the defendant's car was parked off the roadway and that it was not running when Officer Cate arrived. The defendant, he reiterated, was asleep at the wheel. He acknowledged that he could not recall whether the car's window was down or up. He said that the defendant was cooperative throughout the investigation. He could not recall whether the defendant had attempted to explain the extent of his medical problems or whether the defendant told him that the car was not operational. He also could not recall whether the defendant told him that a friend had gone to get a trailer to tow the car.

During redirect-examination, Officer Cate estimated that he remained at the scene for more than an hour and that, during that time, no one arrived with a trailer other than the tow truck driver called by Officer Cate.

Doctor Kenneth Ferslew, the director of the toxicology section at the William L. Jenkins Forensic Center at East Tennessee State University, testified that he reviewed the affidavit of complaint prepared by Officer Cate, the report drafted by Officer Cate at the time of the defendant's arrest, the scoring of the field sobriety tests, the report of toxicology testing from the TBI, and information from the Washington County Sheriff's Office regarding the defendant's "body weight, his address, his age, his date of birth, and other pertinent information." Doctor Ferslew said that assuming "a normal rate of elimination," the defendant's maximum blood alcohol concentration at the time he was first observed by Officer Cate would have been "0.094 grams percent." That level of intoxication would have resulted in "loss of inhibition," "impairment of his motor functions, slurred speech, altered perception," "a change in judgment[,] and loss of motor skills." These symptoms would have been exacerbated by the level of oxycodone and methadone, both opiates, in the defendant's blood. He described the level of oxycodone as being "in a toxic to potentially lethal concentration range." The level of methadone was in the "therapeutic range," and the level of alprazolam, a benzodiazepine, was "in a therapeutic to potentially toxic concentration range." He said that the combination of alcohol, opiates, and benzodiazepine would have caused the defendant to be more impaired than had he consumed any one of them individually. Doctor Ferslew concluded that, based upon the levels of the drugs and alcohol in his system, the defendant would have been impaired when Officer Cate observed him asleep behind the wheel of his car.

During cross-examination, Doctor Ferslew explained, "When someone takes a drug chronically, if you're prescribed a medication, you become more tolerant to it." He acknowledged that the defendant's tolerance to any of the individual drugs in his system would have affected his level of impairment, but he maintained that the defendant was impaired.

Following Doctor Ferslew's testimony, the State rested, and the defendant presented the testimony of Arnold Saylor. Mr. Saylor testified that on the evening of May 30, 2012, the defendant, who worked with Mr. Saylor, came to Mr. Saylor's residence on Sand Valley Road. Mr. Saylor said that his driveway was 630 feet from the Arrow Jet parking lot. He said that he and the defendant worked on the defendant's car in the "big bay" of the shop behind Mr. Saylor's house. Mr. Saylor explained that "some additive . . . that's supposed to clean the engine out" had been added to the defendant's engine during his last oil change and that "it really started knocking, giving a lot of trouble." He said that the men decided "to change it again and get that stuff out of it to maybe get the car to stop knocking."

He said that in addition to changing the oil, they also worked on the "tension, or pulley" to alleviate the noise, which he described as "metal smacking - - slapping together sounding like something fixing to fly apart."

At some point later in the evening, a decision was made for Mr. Saylor to test drive the defendant's car. He said, "I've worked on cars a whole lot more than [the defendant] and I was going to run it smooth, bring the RPM's up gradually to try to get the oil moving back through the engine." He said that instead of getting better, the car "just got worse" and that he "couldn't get the oil to start circulating and . . . finally [it] just locked up." He said that after the car "locked up," he "let it roll across the street into the parking lot" and that he "swung it at an angle to where [he] could load it onto a trailer 'cause . . . it was done for the engine . . . the car was going nowhere after that." He said that the car would not start after it came to rest in the Arrow Jet parking lot.

Mr. Saylor said that at that point, he decided to locate one of the several trailers that he used in his business to take the car "somewhere that had a lot more knowledge than us to be fixed." He testified that he first attempted to get a trailer from his brother, but he eventually found a suitable trailer in the "Fox Meadows Subdivision. It's kind of on the Blountville, Bluff City, you know, line right there." Mr. Saylor said that he made the 24-mile drive to get the trailer alone, the defendant having decided to wait with the car. Mr. Saylor testified that it took him a while to get the trailer and hook it up by himself and that, when he returned to the Arrow Jet parking lot, both the defendant and the car were gone.

At some point, Mr. Saylor learned that the defendant had been arrested for DUI and that the car had been impounded. He assisted the defendant in retrieving the car from impoundment. He said that before he arrived, the defendant had rolled the car from the police impound lot into the parking lot of a nearby Shell station, where Mr. Saylor "wrenched [sic] it up on the trailer and strapped it off and took it to my shop." He testified that he took the car to "AAA down off 11-E" and left it there.

Mr. Saylor, who testified that he had known the defendant for "probably twenty years," said that the defendant had walked with the assistance of a cane due to injuries he sustained in a motorcycle accident.

During cross-examination, Mr. Saylor said that the defendant decided to stay with the car rather than to go with Mr. Saylor to get the trailer because "[h]e was real tired. He's got a lot of injuries. . . . [H]e takes a lot of medication for them and he just wanted to stay there and rest." He recalled that the defendant was in the passenger's seat when he left to go get the trailer. He said that it was several hours before he returned with the trailer because he had to unload roofing materials from the trailer before he could use it to haul the

defendant's car. He said that when he arrived to find the defendant gone, he assumed the defendant had been arrested for DUI. Mr. Saylor testified that after he was unable to contact the defendant, he laid down to rest and then telephoned the detention center at approximately 4:30 a.m.

Mr. Saylor conceded that he saw the defendant drinking beer on the night of the offense but said that he did not see him take any medication. Mr. Saylor said that when he arrived to help the defendant retrieve the car after it had been impounded, both the defendant and the car were in the parking lot of the Shell station. He said that the defendant was alone and that he assumed that the defendant had rolled the car down the steep hill from the impound lot into the Shell lot. He maintained that the car would not run.

The defendant testified that he went to Mr. Saylor's house at approximately 3:00 p.m. on May 30, 2012, so that Mr. Saylor could help him work on his car. The defendant explained that he put an "additive which is called CRC" into the engine of his car "to break free any gunk that is in the engine." He said that he followed the product's directions, which specified running the engine "for thirty to sixty miles and then change the oil." After he completed the process, he started the car, and the car made "a loud metallic sound" immediately. He said that he took the car to Mr. Saylor's because he believed "that possibly a tensioner might have come loose," and Mr. Saylor "had also put a tensioner in there." After replacing the tensioner, Mr. Saylor "then put a fresh patch of oil in it and then that's whenever we attempted to drive the car."

The defendant said that Mr. Saylor drove the car during the test drive because he had more mechanical know-how than the defendant and because the defendant "had drank a few beers." He testified that the car made it only "fifty yards before it seized up to the point to where it was . . . locked up." He stated that Mr. Saylor then "pushed the clutch in and kicked it into a neutral gear . . . and coasted it to Arrow Jet parking lot." The defendant said that he decided to stay in the car because he "didn't want to abandon the car there" and because he "felt like the right thing to do was to . . . stay with the vehicle." He added that he was "exhausted" and "hurting quite bad." After Mr. Saylor left, the defendant "got in the drivers seat, leaned the seat back a little bit[,] and just rested." He explained that he got into the driver's seat because the passenger's seat would not recline.

The defendant testified that a 2001 motorcycle accident resulted in extensive injuries to his chest, left leg, and right ankle. As a result, he relied on a cane when walking. He said that he explained to Officer Cate that he would have difficulty performing the field sobriety tests. The defendant said that at the time of the offenses, he had been taking oxycodone as prescribed for pain for 12 years and that he had begun taking methadone as part of a trial for a longer-lasting pain medication. The defendant said that he had been

taking alprazolam for four or five years.

The defendant said that after he was released following his arrest in this case, his wife took him to retrieve the car from the impound lot. He said that "an individual there" helped him "push it off the property" and that his wife "waited at the bottom of the hill and whenever the road was clear [he] coasted across to the Shell parking lot." At that point, the defendant's wife left to go to work. Mr. Saylor arrived approximately 20-30 minutes later with a trailer. The defendant said that he tried to explain to Officer Cate that the car was inoperable, but the officer told him "that it didn't matter, it was irrelevant."

During cross-examination, the defendant denied telling Officer Cate that he had driven the car to the Arrow Jet parking lot or that he was on his way home. He insisted that he told the officer that Mr. Saylor had driven the car to the parking lot, that the car was inoperable, and that Mr. Saylor had gone to get a trailer to tow the car back to Mr. Saylor's house.

Rhonda Saylor, Mr. Saylor's sister, testified that she lived with her brother and that she recalled the defendant's coming to the residence on May 30, 2012, so that Mr. Saylor could work on his car. She said that the car made a really loud noise. At one point, she said, she "looked out to see what the[] noise was and they were trying to drive it. [Mr. Saylor] was driving." She said that the defendant was in the passenger's seat. Sometime thereafter, Mr. Saylor returned to the residence alone and told her that "[t]he car quit on them" and that he was going "to get his trailer." She said she thought that Mr. Saylor had to go to Blountville to get the trailer. Ms. Saylor said that she was "real shocked" to find out that the defendant had been accused of DUI because she "knew [the defendant] wasn't driving."

The defendant's wife, Debbie Morrell, testified that the defendant walked with a pronounced limp and that he used a cane to get around "[m]ost of the time." She said that the passenger's seat of the defendant's car "couldn't recline back. You had to sit straight up." Following the defendant's release after his arrest for DUI, she took him to the impound lot to retrieve the car. Ms. Morrell explained what happened next, "I had my windows up. I didn't hear it start. I had my air conditioner on so I didn't hear it start but I know he tried to start it." She said that "[h]e had to get a guy to help him to kind of push it and then he coasted down the hill" as she "guided him, you know, to the Shell Station across the street." At that point, she left.

Based on the foregoing proof, the jury convicted the defendant as charged of one count of DUI. Following the jury's verdict, the defendant stipulated that the conviction offense was his third conviction of DUI. The defendant waived the preparation of a presentence report, and the parties waived a sentencing hearing. The trial court imposed a

sentence of 11 months and 29 days to be served as 120 days' incarceration followed by probation. The court also suspended the defendant's driver's license for a period of six years.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence was insufficient to support his conviction, that the verdict of the jury was not unanimous, and that the trial court erred by failing to declare a mistrial after the prosecutor made an improper remark during closing argument. We consider each claim in turn.

## *I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, claiming that the State failed to establish that he was driving or in physical control of his vehicle on the night of the offense. The State contends that the evidence supports his conviction.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case,

It is unlawful for any person to drive or to be in physical control
of any automobile . . . on any of the public roads and highways
of the state . . . while:

(1) Under the influence of any intoxicant, marijuana,

-7-

controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess[.]

T.C.A. § 55-10-401(a)(1).

Examined in the light most favorable to the State, the evidence adduced at trial established that Officer Cate, who was dispatched to the Arrow Jet parking lot in response to a call that "a person that appeared to be passed out in a vehicle in the parking lot," found the defendant asleep in the driver's seat of his vehicle. The keys were in the ignition. According to Officer Cate, when asked how he had come to be parked in the Arrow Jet parking lot, the defendant responded that he had driven there. The defendant also told Officer Cate that he had been visiting a friend and was on his way home. Officer Cate denied the defendant's telling him that Mr. Saylor had driven the car into the Arrow Jet parking lot. Officer Cate could not recall whether the defendant made any comment about the car's being inoperable. The defendant presented witness testimony to support his claims that he did not drive the vehicle into the Arrow Jet lot and that the vehicle was inoperable when he was discovered by Officer Cate, which testimony he deems "uncontroverted." The defendant's assertions that the testimony of the defense witnesses was "uncontroverted" or that each defense witness corroborated the others overlooks the fact that the jury, as the trier of fact and the final arbiter of witness credibility, was free to reject any or all of the testimony presented by the defense witnesses. The defendant essentially asks this court to substitute its judgment for that of the jury, an invitation we must decline. *See Dorantes*, 331 S.W.3d at 379.

## II. Juror Unanimity

The defendant next contends that because the trial court did not require the State to elect between the alternative modes of committing DUI, a serious question exists whether the verdict of the jury was unanimous. He argues that "[u]nder the unique set of facts in this specific case, it is probable that some jurors convicted the [defendant] for the act of driving and others for being in physical control of the vehicle." The State responds that "the jury's general verdict should be presumed unanimous" because the defendant was convicted of a single offense based upon a single course of conduct.

"Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, 'there should be no question that the unanimity of twelve jurors is required in criminal cases under our state

constitution.'" *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993) (quoting *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). To ensure juror unanimity in cases wherein the evidence establishes that the accused committed more offenses than there are charged offenses, the State must elect the facts upon which it is relying to establish the charged offense or offenses. *See State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001); *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "When the [S]tate presents proof [of] many offenses within an alleged time period, but neglects election, the jury is essentially permitted to 'reach into the brimming bag of offenses and pull out one for each count.'" *State v. McCary*, 119 S.W.3d 226, 241 (Tenn. Crim. App. 2003) (quoting *Tidwell v. State*, 922 S.W.2d 497, 501 (Tenn. 1996)).

Conversely, when the evidence shows multiple acts of the defendant that constitute a single, continuing offense, however, election is not required.

> When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the [S]tate will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). "An offense may be considered a continuing offense only when 'the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that [the legislature] must assuredly have intended that it be treated as a continuing one.'" *State v. Legg*, 9 S.W.3d 111, 116 (Tenn. 1999) (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)). The right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based upon a single criminal occurrence. *State v. Lemacks*, 996 S.W.2d 166, 171 (Tenn. 1999).

In *Legg*, our supreme court cited with approval the opinion of this court ruling that DUI was a continuing offense. *See Legg*, 9 S.W.3d at 116 (citing *State v. Rhodes*, 917 S.W.2d 708, 713 (Tenn. Crim. App. 1995)). In *Rhodes*, this court reiterated our earlier

holding that DUI was a continuing offense, *see Rhodes*, 917 S.W.2d at 713 (citing *State v. Adkins*, 619 S.W.2d 147, 149 (Tenn. Crim. App. 1981); *State v. Corder*, 854 S.W.2d 653, 654 (Tenn. Crim. App. 1992); *State v. Ford*, 725 S.W.2d 689, 690 (Tenn. Crim. App. 1986)), and stated explicitly that "'a defendant can only be prosecuted once for a continuous period of drunk driving,'" *Rhodes*, 917 S.W.2d at 713 (quoting *Reeve v. State*, 764 P.2d 324, 326 (Alaska Ct. App. 1988)). Because DUI is a continuing offense, the State was not required to elect between the defendant's acts of driving to the Arrow Jet parking lot and his remaining behind the wheel.

That the offense of DUI may be committed by either driving or being in physical control of a vehicle does not change our conclusion because the need for election is not implicated by the statutory use of proscriptive terms in the disjunctive. *See Schad v. Arizona*, 501 U.S. 624, 649 (1991) ("As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission.") (Scalia, J., concurring); *see also* T.C.A. § 40-18-112 ("Where . . . the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed . . . in different modes, or by different means, if the jury is satisfied that the act was committed . . . .in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to . . . which mode, or by which of the means charged, the act was committed."); T.C.A. § 40-13-206 (1997) ("When the offense may be committed by different forms, by different means or with different intents, the forms, means or intents may be alleged in the same count in the alternative."). Of particular note, the Supreme Court has held that the federal constitution does not require juror unanimity on a single theory of the offense unless the "differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." *Schad*, 501 U.S. at 633. Here, the defendant was charged with a single count of DUI based on a continuing course of conduct that began when he got behind the wheel and drove to the Arrow Jet and ended when he was discovered by Officer Cate. As indicated above, our courts have never treated the alternate means of committing DUI as "so disparate as to exemplify two inherently separate offenses." *Id.* at 643; *see also id.* at 640 ("[W]e have often found it useful to refer both to history and to the current practice of other States in determining whether a State has exceeded its discretion in defining offenses.") (citation omitted). The charge in this case could have been proven by a showing either that the defendant was driving or in physical control of the vehicle, and the evidence adduced at trial was sufficient to support the defendant's conviction under either theory. *See, e.g., State v. Charles Michael Hall*, No. W2004-01165-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Apr. 13, 2005) ("[W]e conclude that a rational trier of fact could have found the evidence sufficient to convict the defendant under either the theory that he drove or exercised physical control over the vehicle while intoxicated.").

Additionally, that the defendant had different defenses directed at the two modes of committing DUI does not alter our conclusion. The defendant has cited no authority for the

-10-

proposition that the presentation of any particular defense alters the character of the offense as defined by the legislature, and we find none. To the contrary, as we have indicated, the determination whether an offense is a continuing offense depends upon the statutory language proscribing the crime, *see Legg*, 9 S.W.3d at 116; *see also Schad*, 501 U.S. at 639 ("[W]e have 'stressed that . . . the state legislature's definition of the elements of the offense is usually dispositive.'" (citation omitted)), and the presentation of a particular defense to the charges could not alter that, *see Adams*, 24 S.W.3d at 295 ("[T]his Court will look to the statutory elements of the offense and determine whether the elements of the crime themselves contemplate punishment of a continuing course of conduct."). To adopt the defendant's position would have the effect of requiring the State to "elect the *facts to support elements* rather make an election of *offenses*" when, in truth, our case law has never "required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged." *Adams*, 24 S.W.3d at 297 (citing *Lemacks*, 996 S.W.2d at 170; *State v. Cribbs*, 967 S.W.2d 773, 787 (Tenn. 1998)).

In summary, because DUI is a continuing offense, the State was not required to make an election between his driving or being in physical control of his vehicle.

### III.  Improper Remarks

In his final complaint, the defendant contends that the trial court should have dismissed the indictment or declared a mistrial when the prosecutor made an improper remark during closing argument. The State asserts that the defendant has failed to establish any prejudice resulting from the prosecutor's statement or the corrective action taken by the trial court.

During his closing argument, the prosecutor remarked, "Mr. Saylor testified that they had to take [the defendant's car] to a professional after he couldn't fix it. The defense had every opportunity in the world to provide proof . . .". At that point, defense counsel requested a bench conference and objected to the remark on grounds that it impermissibly shifted the burden of proof. The trial court sustained the objection but denied the defendant's motion to dismiss the case. The court then provided the following curative instruction to the jury:

> Ladies and Gentlemen, there's been an objection made saying
> that the defense has shown nothing. You need to understand
> I've overruled that motion, however, you need to understand
> that the defendant has no burden of proof whatsoever in a
> criminal case. The defendant has no burden to do anything.
> They could sit silent at that table, present no proof whatsoever,

and the [S]tate always has the burden and that burden never shifts to the defendant. So, that objection is sustained. You're to remember that instruction that – that the defense has the burden to prove nothing in the case. Everyone understand?

The prosecutor then apologized for having made the remark.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id*.

The defendant has failed to establish that the trial court abused its discretion by refusing to grant a mistrial. The prosecutor's remark, although clearly improper, was fleeting, and the trial court provided a lengthy and forceful curative instruction. In addition, the prosecutor accepted responsibility for his remark and apologized for having made it. Under these circumstances, the record establishes that the isolated remark did not inflict "damage . . . to the judicial process" so as to "preclude[] an impartial verdict." *See id.*

*Conclusion*

The evidence was sufficient to support the defendant's conviction. Because DUI is a continuing offense, the State was not required to make an election of offenses. Finally, the trial court did not abuse its discretion by refusing to grant the defendant's motion for a mistrial. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE