1367-15

NUMBER PD-1367-15

ORIGINAL

TEXAS COURT OF CRIMINAL APPEALS

AUSTIN

==========

CURTIS GLAZE,                                          APPELLANT,

V.

THE STATE OF TEXAS                                     APPELLEE

==========

On appeal from the 9th Court of Appeals

Beaumont, Texas

COA# 09-13-00549-CR

==========

FILED IN
COURT OF CRIMINAL APPEALS

DEC 11 2015

Abel Acosta, Clerk

PETITION FOR DISCRETIONARY REVIEW

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 09 2015

Abel Acosta, Clerk

NO ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Index of Authorities                                                       ii

Identity of Parties and Counsel                       iii

Statement of the Case                          (1)

Procedural History                             (1)

Grounds for Review                             (1)

    THE TRIAL JUDGE ERRED IN THE CHARGE TO THE JURY WHICH PERMITTED A NON-UNANIMOUS VERDICT.

Argument                                                 (1)

Prayer for Relief                               (2)

## INDEX OF AUTHORITIES

STATUES:

Texas Constitution, Art. V §13...                                          (1)

Texas Code of Criminal Procedures Art. 36.29(a)...                         (1)


CASE LAW:

Landrian v. State, 268 SW3d 532 (Tex Crim App 2008)...              (1), (2)

Schad v. Arizona, 501 US 624 (1991)...                                     (2)

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:  Curtis Glaze

APPELLANT"S TRIAL COUNSEL:  Bryan Laine, 1045 Redwood, Kountze, TX, 77625

APPELLANT'S APPELLATE COUNSEL:  Russell J. Wright, PO Box E, Silsbee, TX, 77656

APPELLEE:  The state of Texas

STATE'S COUNSEL:  District Attorney of Hardin County David Sheffield,

PO Box 1409, Kountze, TX, 77625

STATE'S APPELLATE COUNSEL:  District Attorney David Sheffield, and Special

Prosecutor Sue Koriath, PO Box 600103, Dallas, TX,

75360

DISTRICT COURT:  356th Judicial District, Hardin County, the Honorable Steve

Thomas, Judge Presiding

## STATEMENT OF THE CASE

Appellant was convicted by a jury of murder after his pleading of not-guilty. The jury assessed the punishment as life on December 6, 2013.

## PROCEDURAL HISTORY

(1) Notice of Appeal perfected:                    17 March 2014

(2) Conviction affirmed:                    30 September 2015

(3) Extension of time granted to file PDR:                    20 October 2015

(4) Due date of PDR:                    29 December 2015

## GROUNDS FOR REVIEW

THE TRIAL JUDGE ERRED IN THE CHARGE TO THE JURY WHICH PERMITTED A NON-UNANIMOUS VERDICT.

## ARGUMENT

The Trial Judge presented a charge to the Jury which allowed for a conviction of murder or the lesser included offense of manslaughter. The Trial Judge's instruction to the jury, regarding a unanimous verdict contained the following: "After you have reached a unanimous decision, your foreman shall sign the appropriate verdict attached to the charge."

The trial judge instructed the jury that it must reach a unanimous decision, instead of charging the jury that it must reach a unanimous agreement on a verdict as to the crime committed. The Judge's failure to clearly instruct the jury that it must be unanimous about which instance of criminal conduct applied, allowed the jury to rach a unanimous decision without being unanimous as to the criminal conduct the Appellant committed. Therefore, the charge to the jury denied Appellant his right to due process in violation of the Texas Constitution.

A jury in a criminal case must reach a unanimous verdict. TEX. CONST. ART. V, §13; TEX. CODE CRIM PROC. ANN. ART. 36.29(a); Landrian v. State, 268 SW3d

(1)

532, 535-536 (Tex Crim App 2008)(both Texas and Federal courts have held that the jury must be unanimous in finding that the defendant committed a specific statutory crime). The jury must agree that the defendant committed "the same, single specific criminal act." Schad v. Arizona, 501 US 624, 631-32 (1991).

## PRAYER

Appellant prays that this Honorable Court reverse the appellant's conviction for murder and instructs a conviction for manslaughter and remand the case to the trial court for a new punishment trial.

Respectfully submitted,

Curtis Glaze 1894543
Appellant Pro Se
12071 FM 3522
Abilene, TX 79601

(2)

In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00549-CR
_____

CURTIS GLAZE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 356th District Court
Hardin County, Texas
Trial Cause No. 21986

MEMORANDUM OPINION

Appellant Curtis Glaze was indicted for the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1)(West 2011). The jury found Glaze guilty of murder and assessed his punishment at life in prison and a fine of $10,000. In two issues, Glaze argues that the evidence is insufficient to support the judgment and asserts the trial court erred in not instructing the jury that it must reach a unanimous verdict as to the crime committed. We affirm.

1

## Sufficiency of the Evidence

In his first issue, Glaze contends the evidence is insufficient to support the judgment of conviction for the offense of murder. Specifically, Glaze contends that the evidence is insufficient to show that his conscious objective or desire was to cause the death of Brian Drake Jr.

When reviewing the sufficiency of the evidence, we view all evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not our role to sit as the thirteenth juror, and we may not substitute our judgment for that of the factfinder by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). We defer to the factfinder's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and draw all reasonable inferences from basic facts to ultimate facts. *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

As charged in this case, a person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). The offense is a first-degree felony. *Id.* § 19.02(c). Glaze essentially challenges the sufficiency of the evidence that he intentionally or knowingly caused Drake's death. The jury may infer the defendant's intent to kill from the evidence of defendant's acts, words, or conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)). The jury may infer a defendant's intent from any facts in evidence the jury believes proves the existence of that intent, such as the existence of a deadly weapon. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If a deadly weapon, such as a firearm, is used in a deadly manner, the inference is almost conclusive that the defendant intended to kill. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *see also Cordova v. State*, 698 S.W.2d 107, 112 (Tex. Crim. App. 1985). Attempts to cover up guilt or evidence of flight are both relevant to show a defendant's consciousness of guilt. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Cantrell v. State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987).

The evidence at trial included testimony from a number of witnesses. Horace Theal testified that he was with Drake the night of the incident, and that they were hanging out with Briana Herring, Tyler Shute and another friend named Maude. Theal and Herring rode with Drake in Drake's white Chevrolet Silverado truck to drop off Shute at her house, which was located on Glaze Road. Theal testified that after they dropped off Shute at her house, Drake proceeded to drive back down Glaze Road. Theal was in the passenger's seat, and Herring sat between Drake and Theal. After they had been driving a little while down Glaze Road, Theal noticed a vehicle driving "real close" behind them. He later identified the vehicle as a white Dodge Durango.

The Durango continued following very closely behind their vehicle, which concerned Theal. Eventually, the Durango passed them, but when they reached the intersection of Glaze Road and Highway 326, the Durango pulled in front of them and blocked the intersection. Theal recalled that the occupants of the Durango started yelling at them. According to Theal, they decided not to engage the occupants of the Durango, so Drake maneuvered around the Durango and turned left onto Highway 326, traveling north towards Kountze, Texas. The Durango began to pursue them. Theal testified that Drake accelerated his speed to try to get away from the Durango. Theal estimated that they were traveling at speeds around

sixty to seventy miles per hour during the chase. The Durango accelerated as well and was, at times, as close as two to three car lengths behind them.

Theal testified that he started to hear what sounded like rocks hitting Drake's truck. He heard this sound multiple times. Theal then heard a "big loud noise[.]" He testified that "a round went through the back window; and it shattered[,]" causing his ears to ring. Theal looked to his left and saw Drake, who was unresponsive and appeared to be injured or dead. Theal reached over Herring and grabbed the wheel to try to prevent the truck from going off the road; however, the truck eventually left the road, hit a fence, and came to rest in a field. After they came to a stop, Theal looked at Drake and believed he was dead. He and Herring grabbed Drake's phone, got out of the truck, and ran to the other side of the road and into the woods.

According to Theal, the Durango turned around and left. Because Theal believed the Durango would return, he and Herring ran about one hundred yards into the woods and hid behind some trees. Herring called 9-1-1, and they hid in the woods waiting for help to arrive. While they were waiting, the Durango returned and the occupants of the Durango got out and started yelling towards the woods, in the direction where Theal and Herring were hiding. While Theal could not

understand everything that they were yelling, he did hear someone yell, "'Y'all better F-ing come out of the woods[.]"

Herring substantially corroborated Theal's testimony regarding the events that night. She testified that she saw two people in the Durango. She identified the passenger in the Durango as a male, but she could not identify the gender of the driver. She explained that she looked back while the Durango was pursuing them and saw a man leaning out the passenger's window.

Herring testified that while she and Theal were hiding in the woods, she called 9-1-1 to report the shooting. While on the phone with the operator, the Durango returned, and two white men exited the Durango and yelled in their direction that they were going to get them. After about ten minutes, the men left. The State played the 9-1-1 call for the jury, which was consistent with Herring's testimony.

The officer who responded to Herring's 9-1-1 call testified that when she arrived at the scene, she interviewed Herring and Theal. The officer had Herring ride with her back to Glaze Road. Once on Glaze Road, the officer backed into a dirt driveway and waited for other assisting officers to finish their investigation. While waiting, the Durango pulled in front of the officer's patrol car, then took off down the road. Herring identified the Durango as the vehicle involved in the

shooting earlier that night. Another officer pursued the Durango and initiated a traffic stop. According to the officer initiating the stop, when the Durango stopped, Glaze jumped out of the passenger's side of the vehicle and appeared to be looking for somewhere to run. The officer testified they first secured Glaze and then secured the driver of the Durango, Joshua Glaze, Curtis Glaze's cousin.

Officers interviewed Glaze about the incident. A recording of the interview was admitted into evidence and played for the jury. During the interview, Glaze first denied that he was involved in the shooting. Eventually, Glaze stated to them that earlier that evening, while he and Joshua were driving down the road, a red or white truck ran them off the road. According to Glaze, after the encounter with the truck, Joshua followed the truck and drove right up behind it. Glaze did not know who occupied the truck, but speculated that it was someone that Joshua "had beef with." Glaze recalled that Joshua drove to the intersection of Glaze Road and Highway 326 and blocked the roadway. Glaze said that Joshua and the driver of the truck had a verbal altercation and then the man in the truck sped off down Highway 326 and Joshua pursued the truck. Glaze claimed that Joshua told him to "shoot them m----- f------s." According to Glaze, Joshua threatened to shoot Glaze with a pistol if he did not shoot at the truck. Glaze stated in the interview that it was "kill or be killed[.]" Officers were unable to find any evidence to corroborate

7

Glaze's claim that Joshua possessed a pistol, and Glaze was unable to give him any kind of description of the pistol.

Later in the interview, Glaze claimed that he did not intend to kill anyone that night. Glaze insisted that he did not shoot at a person, but shot at a truck. Glaze admitted to shooting a .30-06 rifle at the truck a single time. After shooting at the truck, he and Joshua turned around and went back to Glaze Road and hid his gun in his grandmother's car and then went somewhere else. Officers located the rifle where Glaze indicated he had hidden it. The jurors also heard testimony that a .30-06 rifle is a firearm and is classified as a deadly weapon.

Officers also interviewed Joshua about the shooting. The videotape of Joshua's interview was admitted into evidence and played for the jury. During that interview, Joshua stated that he and Glaze saw a white truck driving recklessly down Glaze Road, which they believed did not belong on the road. Joshua stated that he and Glaze got in the Durango and went down the road to try to find out who was driving the truck. According to Joshua, he tried to stop the truck by passing it and blocking off Glaze Road, but the truck backed up, drove into the ditch, and went around him taking off down Highway 326 towards Kountze. Joshua stated that he then started to pursue the truck down Highway 326. He stated, "and, next thing I know, [Glaze] is shooting out his window" with a rifle. Joshua denied that

he told Glaze to shoot at the truck. Joshua stated that he believed Glaze shot at the truck two or three times, but he was not certain because it all happened so fast. According to Joshua, he told Glaze to stop shooting, then turned the Durango around and went back home.

Mallory Wood testified that on the night of the incident, she and Glaze's three-year-old son were in the truck with Glaze and his cousin, Joshua. Joshua was driving and Glaze was the passenger. She and the child were in the backseat. She testified that they were about to leave the grandmother's house when they noticed another vehicle's headlights coming down the road. She recalled that Glaze and Joshua started questioning who may have been in the vehicle. Wood testified that Joshua turned the lights of the Durango off and waited for the vehicle to pass. She testified that when the other vehicle was in view of the Durango, it "took off" towards Highway 326. She described the other vehicle as a white truck. She testified that Joshua started to pursue the white truck down Glaze Road. Wood testified that Joshua maneuvered in front of the white truck at the intersection of Highway 326 and Glaze Road and blocked the road. Joshua started to get out of the Durango to see who was in the white truck, but the white truck drove around the Durango and turned onto Highway 326 towards Kountze. Joshua proceeded to follow the white truck. She testified that once they were on Highway 326, Glaze

9

leaned out the window and started shooting at the white truck with his .30-06 rifle. She testified that she saw the back window of the white truck shatter, the truck swerve, and then the truck stopped in the grass. She testified that Joshua turned the Durango around and returned to the grandmother's house on Glaze Road. She testified that Joshua and Glaze went back to where they had left the white truck to see what had happened. According to Wood, Joshua and Glaze returned about ten minutes later and told her that they had discovered that they had shot the driver of the white truck in the head.

Another officer with the Sheriff's department testified that during his investigation of the crime scene, he observed the back of Drake's white truck and saw that a bullet had gone through the back window. The jury also heard testimony that a bullet impacted the back window of the white truck just above the rear headrest. The bullet then bypassed the rear headrest and struck Drake's headrest.

A correctional officer for Hardin County Sheriff's Department testified that he was working on November 15, 2012, when he overheard Glaze make a statement to someone on the phone. The correctional officer testified that Glaze either said, "'I got that m----- f---er' or 'I copped that m----- f---er[.]'"

The record in this case shows that Glaze used a firearm to shoot at Drake's truck, which he knew to be occupied. There is evidence that Glaze shot multiple

10

times at Drake's truck. After the shooting, Glaze fled the crime scene. The jury heard evidence that Glaze later returned to the scene and started seeking out the other occupants of the white truck and yelling out threats to them while they hid in the woods. Glaze contends that when he fired his weapon at the truck, he did not intend to kill Drake, that Joshua had forced him to shoot at the white truck after Joshua threatened him he could either "kill or be killed." The jury, as the sole judge of the credibility of the witnesses, could have rejected Glaze's contention and reasonably concluded from all of the evidence that Glaze intended to kill Drake by firing multiple shots, instead of just a single shot as Glaze contended, from a high-powered rifle—a deadly weapon—at the back window of a vehicle he knew was occupied, ceasing his firing only after the truck swerved off of the roadway and rolled to a stop, and from the testimony of the prison guard having overheard Glaze's subsequent statement on the telephone. Having examined the evidence in the light most favorable to the verdict, we conclude that the jury could have determined beyond a reasonable doubt that Glaze intended to cause Drake's death. Therefore, we conclude the evidence is legally sufficient to support Glaze's conviction for murder. We overrule Glaze's first issue.

11

## Charge Error

In his second issue, Glaze contends the trial court erred by presenting a charge to the jury that allowed a non-unanimous verdict. He contends the trial court failed to clearly instruct the jury that it must be unanimous about which instance of criminal conduct applied, murder or the lesser-included offense of manslaughter. He maintains that the trial court's instruction allowed the jury to reach "a unanimous decision" without first reaching a unanimous decision as to which criminal conduct the defendant committed.

We review a complaint of jury-charge error under a two-step process, considering first whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error does exist, we then analyze that error for harm. *Id.* When the defendant fails to object or states that he has no objection to the jury charge, an appellate court will not reverse for jury charge error unless the record shows egregious harm to the defendant. *Ngo*, 175 S.W.3d at 743-44.

Jury unanimity is required in all criminal cases. *Ngo*, 175 S.W.3d at 745. The jury must "reach a unanimous verdict about the specific crime that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). This means that the jury must agree that "the defendant committed the same, single, specific criminal act." *Ngo*, 175 S.W.3d at 745. The Court of

12

Criminal Appeals has recognized three variations that may result in non-unanimous verdicts: (1) "non-unanimity may occur when the State presents evidence demonstrating the repetition of the same criminal conduct, but the actual results of the conduct differed[;]" (2) "non-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions[;]" and (3) "non-unanimity may occur when the State charges one offense and presents evidence of an offense, committed at a different time, that violated a different provision of the same criminal statute." *Cosio*, 353 S.W.3d at 771-72.

The facts in this case do not fall into any of the recognized variations that result in a non-unanimous verdict. *See id.* The indictment charged Glaze with intentionally or knowingly causing the death of Drake "by shooting him with a firearm[.]" The jury charge explained that murder "is when a person intentionally or knowingly causes [the] death of an individual." The jury charge explained that manslaughter occurs when "[a] person . . . recklessly causes the death of an individual." The trial court informed the jury that it must reach a unanimous decision, instructing the jury as follows: "After you have reached a unanimous decision, your foreman should sign the appropriate verdict attached to the charge." The application paragraphs of the charge read as follows:

Now if you find from the evidence beyond a reasonable doubt that on or about the 14th day of November, 2012, in Hardin County, Texas, the defendant, Curtis Glaze, did then and there intentionally or knowingly cause the death of Brian Drake, Jr., by shooting him with a firearm, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm, you will find the defendant guilty of murder as alleged in the indictment. Unless you so find, or if you have a reasonable doubt thereof, and you shall find the Defendant NOT GUILTY of MURDER and next consider whether the defendant did then and there recklessly cause the death of an individual, namely: Brian Drake Jr., by shooting him with a deadly weapon, to-wit: a firearm, you shall find the defendant GUILTY of the lesser included offense of MANSLAUGHTER.

Unless you so find, or if you have a reasonable doubt thereof, you shall find the defendant NOT GUILTY.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

The jury returned a verdict stating, "WE THE JURY, find the Defendant, CURTIS GLAZE, GUILTY of the offense of MURDER, as alleged in the indictment." The jury charge required the jury to reach a unanimous decision before it could complete the verdict form. The charge, as submitted, did not allow for a non-unanimous verdict. We find this issue without merit and overrule Glaze's second issue.

Having overruled both of Glaze's issues, we affirm the judgment of the trial court.

14

AFFIRMED.

 

_____
CHARLES KREGER
Justice

Submitted on January 6, 2015
Opinion Delivered September 30, 2015
Do not publish

Before McKeithen, C.J., Kreger and Horton, JJ.

15